**UNITED STATES of America, Appellee,**

v.

**Michael S. PATASNIK and James Cecere, Defendants–Appellants.**

**Nos. 752, 584, Dockets 95–1063(L), 95–1189(CON).**

United States Court of Appeals, Second Circuit.

Argued Feb. 5, 1996.

Decided July 11, 1996.

**66**

Andrew P. Gaillard, Assistant United States Attorney, New Haven, CT (Christopher F. Droney, United States Attorney for the District, New Haven, CT, on the brief), for Appellee United States of America.

John T. Walkley, Trumbull, CT, for Defendant–Appellant Michael Patasnik.

Michael O. Sheehan, Assistant Federal Public Defender, New Haven, CT (Thomas G. Dennis, Federal Public Defender, New Haven, CT, on the brief), for Defendant–Appellant James Cecere.

Before OAKES, McLAUGHLIN and JACOBS, Circuit Judges.

JACOBS, Circuit Judge:

For almost two years, Michael Patasnik and James Cecere conducted an advance fee loan scam, pocketing over $800,000. The scheme was simple. Patasnik and Cecere held themselves out as lenders or loan brokers who could save small businesses on the brink of disaster. Targeting businesses that needed large and urgent cash infusions and could not arrange financing elsewhere, Patasnik and Cecere falsely represented that they managed a sort of venture capital fund for wealthy investors and had financed many large investment projects in the past. The two encouraged their victims to submit their

own investment proposals, which Patasnik and Cecere then pretended to evaluate. After "approving" the proposals, they explained that a certain percentage of the loan had to be paid in advance as a fee. Fees ranged from $5,000 to over $250,000. They promised in writing that the loan would be forthcoming once the fee was paid. No loans were ever made, of course.

Patasnik and Cecere were charged with ten counts of interstate transportation of funds obtained by fraud (18 U.S.C. §§ 2, 2314) and one count of conspiracy to commit this offense (18 U.S.C. § 371). Patasnik alone was also charged with one count of wire fraud (18 U.S.C. § 1343). Patasnik pled guilty to all twelve counts, while Cecere chose to go to trial. After a two-week jury trial, Cecere was found guilty on the conspiracy count and on nine of the ten substantive counts.

Patasnik challenges his conviction on the ground that he received ineffective assistance of counsel. We reject this argument, and affirm his conviction. Both defendants challenge their sentences on various grounds. We remand for resentencing.

I

Patasnik claims that two of his three lawyers rendered ineffective assistance. John Walkley, Patasnik's lawyer on appeal, represented Patasnik as court-appointed counsel from September 1993, when Patasnik was indicted, until September 1994, when Patasnik privately retained Howard Owens as counsel. Owens represented Patasnik during his plea allocution in October 1994. Patasnik then retained Robert Golger, who represented him at his sentencing hearing in January 1995. Probably because of Walkley's long familiarity with the case, Walkley acted as stand-by counsel, stood in court with Patasnik, and was encouraged by the court to give advice on any issue if he differed with Owens or Golger. The court made clear to Patasnik that he could rely on Walkley for advice at any time. Neither Owens nor Walkley said much at Patasnik's plea allocution. At Patasnik's sentencing hearing, both Golger and Walkley made extensive arguments that paralleled and supplemented one another.

Patasnik points to seven instances in which Owens and Golger supposedly did something wrong. We hold that these seven instances, either alone or in combination, do not constitute ineffective assistance of counsel.

■ Patasnik first argues that Owens should have challenged the government's claim that the fraudulent scheme caused over $800,000 in losses, and should have asked for a hearing on the issue. Owens did in fact challenge the total loss amount at Patasnik's plea allocution, but this issue was relevant only for calculating the sentence under the Guidelines, not for determining whether Patasnik's guilty plea was valid. Between the time of Patasnik's plea and his sentencing, the district court presided over Cecere's two-week jury trial in which numerous witnesses testified about the details of the scam worked by Patasnik and Cecere. Thus, by the time Patasnik was sentenced, the court knew what there was to know about the scheme and the amount of loss it generated. At Patasnik's sentencing hearing, the court explained that a hearing on Patasnik's "factual contentions" was obviated by Cecere's trial. *See United States v. Tracy,* 12 F.3d 1186, 1203 (2d Cir. 1993); *United States v. Carmona,* 873 F.2d 569, 574 (2d Cir.1989). That Owens did not formally request such a hearing therefore did not prejudice Patasnik because the court ruled as if such a request had been made. *See Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984).

■ Second, Patasnik claims that he had a "conflict" with counsel because (according to Patasnik) Owens stated that he would not represent Patasnik if Patasnik chose to go to trial, unless Patasnik made a payment on the fee. Such a statement may have created friction between Owens and Patasnik, but it would not of itself suggest a conflict of interest. Such a conflict exists "when, during the course of the representation, the attorney's and defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Winkler v. Keane,* 7 F.3d 304, 307 (2d Cir.1993) (internal quotations omitted), *cert. denied,* ——

U.S. ——, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994). But here, Owens's interest was always aligned with Patasnik's during the time that Owens represented him: if Patasnik paid him, Owens would be his advocate; without payment, Owens would not.[1] Neither possibility suggests that Owens would act as anything less than a zealous advocate while representing Patasnik. *Cf. id.* at 307–08 (contingency fee in which counsel received higher payment in a criminal case if his client was acquitted created a conflict of interest because "trial counsel had a disincentive to seek a plea agreement, or to put forth mitigating defenses that would result in conviction of a lesser included offense"). Besides, it is likely that Owens's chances of being paid would vary inversely with the severity of Patasnik's sentence, giving him an additional incentive to defend Patasnik zealously. Thus, there was no conflict of interest.

■ Third, fourth, fifth and sixth, Patasnik claims that Owens (and perhaps Golger) failed "to investigate [Patasnik's] background and prior record," failed "to listen to [Patasnik's] version of the case," failed "to prepare properly for possible defenses available to the defendant," and did "not properly investigate[ ] defendant's case and ... prepare[ ] himself for trial." To the extent that these conclusory statements bear on Owens's recommendation that Patasnik plead guilty, they do not undermine the reasonableness of that recommendation: Patasnik points to nothing in his "background," "prior record" or "version of the case" that would have made a lawyer optimistic about taking the case to trial. Nor does Patasnik explain what "possible defenses" he has in mind that might have caused Owens to give different advice. The overwhelming evidence adduced by the government (not to mention the jury's verdict) reinforces the conclusion that Owens's advice was objectively reasonable. *See Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064–65. To the extent that Patasnik's claims bear on Golger's representation of Patasnik at the sentencing hearing, they are defeated by the record: in Golger's well-researched and articulate statement before the district court, he raised numerous objections to the presentencing report and demonstrated a thorough knowledge of Patasnik's background and the record.

■ Finally, we reject Patasnik's claim that Golger rendered ineffective assistance by failing to obtain certified copies of past convictions. In fact, Golger explored this exact issue at the sentencing hearing, arguing that Patasnik's criminal history score could not be determined without certified copies of his past convictions. The court rejected this argument, ruling that the evidence of these convictions as set out in the presentencing report was sufficient "for purposes of a sentencing proceeding." Golger's decision not to press the issue further, and to move on to another point in his long list of objections at the sentencing hearing, was objectively reasonable under the circumstances.

## II

Both Patasnik and Cecere challenge the district court's decision to increase their offense levels under § 3B1.1 of the Sentencing Guidelines for their roles in directing the scheme.

### A

■ Patasnik received a four-level enhancement ("adjustment" in Guidelines lingo) under § 3B1.1(a) as "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). "We have repeatedly stressed that a sentencing court must make specific factual findings in support of any offense-role enhancement." *United States v. Greenfield,* 44 F.3d 1141, 1147 n. 4 (2d Cir.1995). A court must therefore make two specific factual findings before it can properly enhance a defendant's offense level under § 3B1.1(a): (i) that the defendant was "an organizer or leader," and (ii) that the criminal activity either "involved five or more participants" or "was otherwise extensive."

---

1. Patasnik could not reasonably have believed that failure to pay Owens would have left him without counsel, because the district court made it clear that Walkley—who stood by his side throughout the proceedings—was available to act as his lawyer.

*See United States v. Liebman,* 40 F.3d 544, 548–49 (2d Cir.1994) (case remanded because district court made no finding on number of participants or extensiveness of criminal activity); *United States v. Fermin,* 32 F.3d 674, 682 (2d Cir.1994) (case remanded because district court made no finding as to whether defendant was "manager or supervisor" under § 3B1.1(b)), *cert. denied,* —— U.S. ——, 115 S.Ct. 1145, 130 L.Ed.2d 1104 (1995).

 Relying on the government's concession that Patasnik and Cecere were the only "participants" in the scheme, the district court explicitly declined to find that the scheme "involved five or more participants." Nevertheless, the court found that Patasnik and Cecere regularly used the services of at least five other individuals—including their lawyer and their accountant—to help them execute the scheme,[2] as well as various loan brokers. Based on the scheme's widespread nature, the court specifically found that the scheme was "otherwise extensive." Without challenging the court's finding that Patasnik and Cecere used a substantial number of others to effectuate their scheme, Patasnik argues that the evidence was insufficient to support the court's "otherwise extensive" finding. The Sentencing Guidelines explain that the term "otherwise extensive" includes schemes "that involved only three participants but used the unknowing services of many outsiders." U.S.S.G. § 3B1.1, app. note 3. The court's unchallenged finding that the scheme at issue used the services of many outsiders was not clearly erroneous. Under the Guidelines' definition of "otherwise extensive," this finding was sufficient in turn to support the finding that the scheme was "otherwise extensive."

 Patasnik points out, however, that the district court did not make the other required finding: "whether he was an "organizer or leader" of [the] criminal activity." The government claims that the court "implicitly" made the required finding, since it imposed the four-level adjustment under § 3B1.1(a). But it is clear under our precedents that an implicit finding is not enough. *See, e.g., Fermin,* 32 F.3d at 682. Alternatively, the government argues that "there was ample evidence contained in the record from which the District Court could conclude that Patasnik organized and led many of the activities of Cecere." That may be, but our precedents foreclose us from conducting that inquiry. Without the requisite findings from the district court, we simply cannot review an offense level adjustment under § 3B1.1. We therefore remand to the district court so that it may make a finding about whether Patasnik qualifies as an "organizer or leader" under § 3B1.1(a).

## B

Cecere received a three-level increase in his Guidelines offense level by reason of his role in the offense. However, while Patasnik's increase was an "adjustment" dictated by the terms of the Guidelines, Cecere's increase was an "upward departure" subject to the discretion of the district court. *See* U.S.S.G. § 1A4(b), p.s. The abstruse reason for this different treatment of the two defendants will appear as we review the district court's departure.

 Departures, though discretionary, are reviewable. We review departures first to determine if they were "imposed either in violation of law or as a result of an incorrect application of the Guidelines," and second to determine if the "resulting sentence [is] an unreasonably high or low departure from the relevant guideline range." *Williams v. United States,* 503 U.S. 193, 202, 112 S.Ct. 1112, 1120, 117 L.Ed.2d 341 (1992). Here we focus solely on the first inquiry. In asking whether the Guidelines were correctly applied, we "determine, de novo, whether the reasons articulated by the district court for the departure are of a kind or a degree that may be appropriately relied upon to justify the departure." *United States v. Tropiano,* 50 F.3d 157, 162 (2d Cir.1995).

---

**2.** The district court suggested that some of these individuals may have been knowingly involved in the scheme, and that it might therefore have been possible to find that the scheme in fact had five or more "participants."

Here, the district court based its departure on a sound reading of Application Note 2 to § 3B1.1, which states:

To qualify for *an adjustment* under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants. *An upward departure* may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

(Emphasis added.) Under the government's theory of the case, Patasnik and Cecere were the scheme's only two "participants," [3] and Patasnik was the leader. It follows then that Cecere did not lead, organize, supervise or manage anybody within the scheme. Therefore, there can be no "adjustment" to his offense level under Application Note 2. It is just as clear, however, that Cecere had a great deal of decisionmaking responsibility within the scheme. Applying the second sentence of Application Note 2, the district court found that Cecere "exercised management responsibility over the property, assets, or activities of the criminal organization," a finding that is not clearly erroneous. The court therefore departed upward by three levels, apparently to achieve parity with the three-level adjustment that is imposed on defendants who are supervisors or managers in a "criminal activity [that] involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(b). *See United States v. Puello,* 21 F.3d 7, 10 (2d Cir.1994) ("A sentencing court is encouraged to look to analogous guideline provisions to determine the extent of the departure.") (quotations and alterations omitted).

 But there is one problem. Application Note 2 was added to the Sentencing Guidelines by an amendment effective November 1, 1993. Cecere, who was convicted of criminal conduct that ended in December 1992, claims that the Ex Post Facto Clause prevents Application Note 2 from affecting his sentence. Ordinarily, district courts use the Guidelines Manual in effect on the day of sentencing, U.S.S.G. § 1B1.11(a), which in Cecere's case would be the 1994 Manual. But if the use of that version of the Manual would violate the Ex Post Facto Clause, then courts are to use the Manual in effect on the date the crime was committed, U.S.S.G. §§ 1B1.11(b)(1) & (3), which would be the 1992 Manual. If the 1994 Manual subjects Cecere to greater punishment than the 1992 Manual, then the Ex Post Facto Clause would be violated by use of the 1994 Manual. *See Miller v. Florida,* 482 U.S. 423, 430–31, 107 S.Ct. 2446, 2451–52, 96 L.Ed.2d 351 (1987); *United States v. Mapp,* 990 F.2d 58, 61 (2d Cir.1993). On the other hand, if the changes in the 1994 Manual (relative to the 1992 version) are not substantive at all but are merely "clarifying," then the 1994 Manual may be applied. *Mapp,* 990 F.2d at 61; U.S.S.G. § 1B1.11(b)(2).

So the question becomes: could the district court have applied the 1992 version of § 3B1.1 (without Application Note 2) to increase Cecere's sentence in the same way that it did under the 1994 version? Answering this question requires us to consider the way in which departures may be imposed. As we recently explained, departures come in two types: "the guided and the unguided." *United States v. Leonard,* 37 F.3d 32, 36 (2d Cir.1994). Guided departures follow suggestions by the Sentencing Commission (usually made in application notes) about situations in which a departure "may be warranted." *See* § 1A4(b), p.s. These application notes may suggest a specific numerical increase or decrease in the offense level, as in Application Note 1 to § 2G1.1, or they may simply suggest an upward or downward departure in general, as does the application note at issue here. Since the current Application Note 2 did not exist prior to November 1993, the 1992 version of § 3B1.1 contained no statement about possible upward departures for defendants who did not qualify for an adjustment under that section. A "guided" departure was therefore unavailable.

---

**3.** Application Note 1 to § 3B1.1 defines a "participant" as "a person who is criminally respon- sible for the commission of the offense."

Unguided departures, on the other hand, are based on 18 U.S.C. § 3553(b), which authorizes departures if there are circumstances "of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines...." Would the district court have been authorized to depart upward, under § 3553(b), if it had been using the 1992 version of the Manual? The circumstance that prompts a departure in this case is Cecere's supervision or management of the assets that flowed from the fraudulent loan scheme. But § 3B1.1 deals explicitly with the subject of supervisory or management role in a criminal venture; the district court therefore could not have concluded that the Sentencing Commission did not take this circumstance into consideration in formulating the Guidelines. *See United States v. Broderson*, 67 F.3d 452, 458–59 (2d Cir.1995) (factor "generally" taken into account by the Commission is not a valid ground for departure under § 3553(b), unless it exists in "an unusual kind or degree"); *United States v. Johnson*, 964 F.2d 124, 130 (2d Cir.1992) (departure not allowed under § 3553(b) when Commission already took the factor into account). That is, in deciding whether Cecere qualified for an adjustment under the 1992 version of § 3B1.1, a district court would have asked whether the term "manager or supervisor" of a "criminal activity" includes someone like Cecere who supervised assets, but not people. In 1992, there was a circuit split on this question. *Compare United States v. Fuller*, 897 F.2d 1217, 1220 (1st Cir.1990) (term only includes supervisors of people); *United States v. Fuentes*, 954 F.2d 151, 153 (3d Cir.) (same), *cert. denied*, 504 U.S. 977, 112 S.Ct. 2950, 119 L.Ed.2d 573 (1992); *United States v. Carroll*, 893 F.2d 1502, 1509 (6th Cir.1990) (same); *United States v.*

*Mares–Molina*, 913 F.2d 770, 773 (9th Cir. 1990) (same), *with United States v. Chambers*, 985 F.2d 1263, 1267 (4th Cir.) (term includes supervisors of assets), *cert. denied*, 510 U.S. 834, 114 S.Ct. 107, 126 L.Ed.2d 73 (1993); *United States v. Carson*, 9 F.3d 576, 592 (7th Cir.1993) (same), *cert. denied*, —— U.S. ——, 115 S.Ct. 135, 130 L.Ed.2d 77 (1994). If the district court had agreed with the First, Third, Sixth and Ninth Circuits, then no adjustment would have been allowed. If the court had agreed with the Fourth and Seventh Circuits, then an adjustment would have been required. But—under either interpretation, no *Broderson* question of "unusual kind or degree" being present here—the court would have found that the Commission had given consideration to this variable, and that an upward departure was for that reason alone unavailable. We thus stagger to the conclusion that, under the 1992 Manual, the court would not have been able to depart upward from Cecere's offense level as it did here.[4]

This does not end the Ex Post Facto Clause inquiry, however. The ultimate question is whether the change to § 3B1.1 did more than clarify that section, and in fact subjected Cecere to greater punishment than he would have suffered under the 1992 version of § 3B1.1. As the reference to the circuit split in the previous paragraph indicates, the answer to this question would have depended on where one sat. Courts in four circuits would have held that no adjustment was available, meaning that the 1994 version of § 3B1.1 would subject Cecere to greater punishment than the 1992 version. But courts in two circuits would have found no difference in effect between the 1994 and 1992 Manuals, because under each, a three-level increase would be available: as an "adjustment" under the 1992 version, and as a

---

4. This means that on the subject of upward departures, Application Note 2 did more than "clarify" § 3B1.1, since it created a power where there was none before. We note that the Sentencing Commission says that the amendment was clarifying, U.S.S.G. Appendix C, Amend. 500 (1993), a position to which we must give substantial, although not absolute, deference. *See United States v. Perdomo*, 927 F.2d 111, 117 (2d Cir.1991). Two circuits (ironically, the ones that had their decisions overturned by the Sentencing

Commission's amendment) have split over whether the amendment is clarifying or substantive. *Compare United States v. Capers*, 61 F.3d 1100, 1110 (4th Cir.1995) (substantive), *cert. denied*, —— U.S. ——, 116 S.Ct. 1830, 134 L.Ed.2d 935 (1996), *with United States v. Fones*, 51 F.3d 663, 669 (7th Cir.1995) (clarifying). But it does not appear that the Sentencing Commission or either circuit looked at the issue in terms of a change in the power to depart, as we have here.

"departure" under the 1994 version. In our Circuit, the district courts would have had a choice, since we had not (and still have not) taken a position on the subject. But blessed as we now are by Application Note 2, we know that the Commission intended the term "manager or supervisor" to include only supervisors of people, not supervisors of assets. Although we cannot know what choice the courts of this Circuit would have made in interpreting § 3B1.1, we are prepared to decide for these purposes that we would have gotten it right.

Under the 1992 Manual as interpreted by the First, Third, Sixth and Ninth Circuits, the court could not have adjusted Cecere's offense level upward under § 3B1.1. Use of the 1994 Manual thus subjected Cecere to a three-level increase that he would not have been subject to (either as an adjustment or as an upward departure) under the 1992 Manual, and therefore violated the Ex Post Facto Clause. We therefore hold that the district court erred in departing upward by three levels for Cecere's role in the offense.

### III

■ The district court enhanced the sentences of Patasnik and Cecere by two levels under § 3A1.1(b) of the Guidelines "based on the vulnerable nature of the victims in this case." Section 3A1.1(b) provides for a two-level enhancement if

the defendant[s] knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the[ir] criminal conduct. . . .

We review the court's factual finding that "a victim was particularly susceptible" for clear error. 18 U.S.C. § 3742(e); *United States v. Borst,* 62 F.3d 43, 46 (2d Cir.1995).

■ Patasnik and Cecere argue, as they must, that none of their victims was "particularly susceptible". We recently interpreted § 3A1.1(b) in *Borst,* holding that a victim's precarious financial situation alone may serve as the sole basis of a § 3A1.1 enhancement. Such an enhancement is particularly appropriate when . . . the success of the defendant's criminal scheme depended on the victim's financial desperation.

62 F.3d at 47. In the last year, the Fourth and Eleventh Circuits have confronted "advance fee loan schemes" very similar to the one before us, and have ruled that the victims—people unable to secure ordinary financing because of poor credit histories—were "particularly susceptible" under § 3A1.1(b). *See United States v. Page,* 69 F.3d 482, 489 (11th Cir.1995) ("It is clear that having bad credit or otherwise being in a precarious financial situation is a 'vulnerability' to fraudulent financial solicitations such as the advance fee loan scheme in this case. *See* [*Borst* ]."); *United States v. Holmes,* 60 F.3d 1134, 1137 (4th Cir.1995) ("It is manifest that persons with poor credit ratings who have been turned down elsewhere for loans would be unusually vulnerable, that is, more prone than most to yield to the melodious beseeching of a charlatan who assures them that their dreams are within their grasp.").

This case fits squarely within our *Borst* decision. False financial hope is promoted more easily to persons whose defenses have been lowered by anxiety and the prospect of ruin; indeed, the success of an advance fee loan scheme depends in part on their desperation. Patasnik and Cecere in their briefs characterize the victims as members of that broad class of businesspeople who do not qualify for financing in the primary markets and look for funds in the secondary markets. True, not every individual or business that resorts to the secondary financing market is "particularly susceptible" to swindlers. The key variable is whether "the success of the defendant's criminal scheme depended on the victim's financial desperation." *Borst,* 62 F.3d at 47. Here, Cecere himself described one of the victims as "strangling" in his financial desperation. Others were equally desperate. Two of the victims owned mobile home parks and, unable to secure bank financing, faced foreclosure. The record reflects that their desperation made them particularly susceptible to Patasnik and Cecere's carefully crafted promises. (When the promised funds turned out to be illusory, both victims lost their businesses.) They there-

fore fit within the terms of § 3A1.1(b), as construed by *Borst*.

Patasnik and Cecere also claim that there is no evidence to suggest that they knew or should have known the "particularly susceptible" nature of their victims. But the evidence is overwhelming that the point of the scheme was to target businesses that were on the brink of ruin. If Patasnik and Cecere could not gauge from the outset the desperation of their prospective victims, they learned of it when the victims submitted information about the financial condition of their businesses in connection with their financing proposals. Therefore, we easily conclude that the district court's finding that the defendants "cho[se] the victims in this case" with full knowledge of their circumstances is not clearly erroneous.

## IV

The district court adjusted Patasnik's offense level downward by two levels under § 3E1.1(a), because Patasnik "clearly demonstrate[d] acceptance of responsibility for his offense." U.S.S.G. § 3E1.1(a). Patasnik claims he deserved a three-level adjustment under § 3E1.1(b)(2) because he "timely notifi[ed] authorities of his intention to enter a plea of guilty." [5] U.S.S.G. § 3E1.1(b)(2). The government disputes timeliness.

On September 1, 1994, about one year after Patasnik's indictment, he entered into a proffer agreement with the government in which he agreed to disclose his crimes truthfully. On September 16, the government drafted a plea agreement that contemplated a guilty plea to one of the counts of interstate transportation of funds obtained by fraud; but Patasnik never signed the agreement. On October 4, the day scheduled for jury selection, Patasnik indicated that he was prepared to plead guilty, but then asked for more time to think about it. On October 7, jury selection having been postponed, Patasnik pled guilty to all twelve counts in the indictment.

As this chronology shows, Patasnik did not definitively "notify[ ] authorities of his intention to enter a plea of guilty" until, at the earliest, some time shortly before jury selection. His vacillation means that the proffer agreement and the unexecuted plea agreement do not necessarily constitute the requisite notice. This is because Patasnik's wavering impaired the benefit that the government derives from a timely notice of intention to plead guilty.[6] And the government must benefit for § 3E1.1(b)(2) to apply: the defendant must "assist[ ] authorities in the investigation or prosecution of his own misconduct" in a way that "permit[s] the government to avoid preparing for trial." U.S.S.G. § 3E1.1(b)(2). It was therefore well within the district court's discretion to conclude that Patasnik's notification of his intention to plead guilty was not "timely" under the circumstances. *See* U.S.S.G. § 3E1.1, app. note 6 ("The timeliness of the defendant's acceptance of responsibility ... is context specific."); *id.*, app. note 5 (district court's evaluation of a defendant's acceptance of responsibility "is entitled to great deference on review"). A two-level adjustment was therefore appropriate.

---

5. Section 3E1.1(b) provides in full:

If the defendant qualifies for a decrease [of 2 levels] under subsection (a), the offense level determined prior to the operation of subsection (a) is level 16 or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by taking one or more of the following steps:
(1) timely providing complete information to the government concerning his own involvement in the offense; or
(2) timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the court to allocate its resources efficiently,

decrease the offense level by 1 additional level.

6. In granting Patasnik a two-level decrease, the court "note[d] that the defendant had indicated a willingness to plead guilty prior to trial in this matter as evidenced by the September 1, 1994 dated proffer agreement, and the ultimately unexecuted plea agreement." This statement supports the court's conclusion that Patasnik accepted responsibility for his crime, entitling him to a two-level decrease, but does not necessarily mean that this "willingness" to plead guilty (not expressed definitively until the eve of trial) constitutes a "timely notifi[cation]" that would entitle him to a three-level decrease.

V

Patasnik claims that the district court erred in calculating his criminal history score. Patasnik was sentenced under "category VI," which includes defendants who have 13 or more criminal history points. Patasnik was convicted three times for writing bad checks and received concurrent two-year prison sentences on each conviction. The district court assessed three criminal history points for each of the three sentences. *See* U.S.S.G. § 4A1.1(a). He was also assessed three points for another two-year prison sentence (which ran concurrently with the bad check sentences) imposed for violating probation. *Id.* Finally, he was assessed one point for a non-prison sentence imposed for being convicted of petit larceny. U.S.S.G. § 4A1.1(c). The total is therefore thirteen points.

■ Patasnik challenges this calculation in two ways. First, he claims that the three bad check sentences were "related" and therefore support only three criminal history points, not nine. Section 4A1.2(a)(2) of the Guidelines explains that "[p]rior sentences imposed in related cases are to be treated as one sentence for purposes of § 4A1.1(a), (b), and (c)." Application Note 3 to this section defines the term "related cases":

> [P]rior sentences are considered related if they resulted from offenses that (1) occurred on the same occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing.

Even though the three check-writing offenses and the probation violation occurred on different dates and were given different docket numbers by the court, Patasnik argues that they were consolidated for sentencing (and are therefore "related"), because he was sentenced for the four offenses by the same judge at the same time and was given four concurrent two-year sentences. If he is right, then the district court assessed six criminal history points too many, and the resulting Guidelines range would be 70 to 87 months, well below his current sentence of 115 months.

In finding that the three sentences were not "related," the district court rejected Pa-

tasnik's argument that the convictions were consolidated for sentencing: "the fact that he was given concurrent sentences in each item on the same day doesn't vitiate [the] finding [that the sentences are not related]." We review this finding for clear error. *United States v. Gelzer*, 50 F.3d 1133, 1143 (2d Cir. 1995).

We considered a similar set of facts in *Gelzer*, and our holding there applies with equal force here:

> [C]ases are not deemed consolidated simply because the defendant received concurrent sentences even when the concurrent sentences are imposed on the same day. Gelzer's two prior offenses were sentenced together. However, there was no order of consolidation. And they were factually distinct: different victims and different substantive crimes [both attempted robberies], separated by almost two months.

*Id.* (citations omitted). Here as in *Gelzer*, the underlying offenses occurred on different dates, the victims were different, and there is no evidence of an order of consolidation. We therefore hold that it was not clear error for the district court to find that the three bad check sentences were not related.

■ Patasnik's second contention is that the district court erred in adding one criminal history point for his petit larceny conviction. Without this point, Patasnik's criminal history category would be five, and his Guidelines range would be 84 to 105 months. Patasnik did not raise this claim in the district court, so we review it for plain error. *United States v. Keppler*, 2 F.3d 21, 23 (2d Cir.1993).

According to the presentencing report, Patasnik was arrested in New York State for grand larceny, and was convicted of petit larceny. A sentence of conditional discharge was imposed. *See* N.Y. Penal Law § 65.05(1) (McKinney 1987). Petit larceny is a misdemeanor in New York, *id.* § 155.25, and includes the offense of issuing a bad check. *Id.* § 155.05(2)(c). Under New York law, issuing a bad check means intentionally writing or passing a check with insufficient funds. *Id.* § 190.05(2). Under the Guidelines, sentences for certain misdemeanor offenses are not counted in the defendant's

criminal history score. U.S.S.G. § 4A1.2(c)(1). One of the offenses listed by the Guidelines is writing or passing a check with insufficient funds.[7] (It does not matter how that offense is styled in the relevant jurisdiction, *e.g.,* petit larceny. *Id.*) The pre-sentencing report contains no details of Patasnik's petit larceny, and the government provides none. Patasnik asserts that the conviction was for issuing a bad check. If this is so, then it would be plain error to add one point to his criminal history score by virtue of the sentence imposed for this conviction. Because there is no information in the record that would allow us to answer this question, we remand to the district court so that it may make findings about the relevant particulars of Patasnik's petit larceny conviction.

## VI

The district court imposed a restitution penalty of $846,203, to be paid in monthly installments of $400 "until the payment is made in full." [8] Patasnik claims that the district court did not "consider" the factors (including Patasnik's ability to pay) that must be considered under 18 U.S.C. § 3664(a). The government counters that the court must have been "mindful" of Patasnik's inability to make full restitution, because it required relatively modest installment payments. The record does not indicate that the district court considered the § 3664(a) factors. We have explicitly stated on several occasions that restitution penalties are not valid absent compliance with this statutory command. *See, e.g., United States v. Khan,* 53 F.3d 507, 519 (2d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 697, 133 L.Ed.2d 655 (1996); *United States v. Soto,* 47 F.3d 546, 550–51 (2d Cir.1995). We therefore remand to the district court so that it may determine whether the current restitution penalty is appropriate after considering the factors set out in § 3664(a).

\* \* \* \* \* \*

Patasnik's conviction is affirmed. Patasnik's and Cecere's cases are remanded for resentencing consistent with this opinion.

---

7. The guidelines merely label the offense, "Insufficient funds check." U.S.S.G. § 4A1.2(c)(1).

8. Under this installment schedule, Patasnik will complete payment in the year 2171.