118 F.3d 65
 UNITED STATES of America, Appellee,
v.
Dennis O'NEIL; Ronald Bauer; Richard Procknal; Richard
O'Neil; Deborah Sills; Kenneth Hughes; Maria Bennett;
Gregory Hinaman; Thomas R. Smith; John Andrews; Martin
Victor; Leo Gastle; Grand National Products; Grand
American Marketing, Inc.; Universal Promotions; Northtown
Universal Products, Inc., Defendants,
Thomas Saia, Defendant-Appellant.
 No. 1531, Docket 96-1623.
 United States Court of Appeals,
Second Circuit.
 Argued May 1, 1997.
Decided June 18, 1997.
 
 Marc S. Gromis, Assistant United States Attorney, Buffalo, NY (Patrick H. NeMoyer, United States Attorney, Western District of New York, Buffalo, NY, of counsel), for Appellee.
 Mark J. Mahoney, Harrington & Mahoney, Buffalo, NY, for Defendant-Appellant.
 Before: MINER and CALABRESI, Circuit Judges, and SHADUR, District Judge.*
 MINER, Circuit Judge:
 
 
 1
 Defendant-appellant Thomas Saia appeals from a judgment entered in the United States District Court for the Western District of New York (Arcara, J.) convicting him, following a jury trial, on two counts of conspiracy to commit wire fraud, in violation of 18 U.S.C. § 371, and three counts of wire fraud, in violation of 18 U.S.C. § 1343, and sentencing him to a 110-month term of imprisonment, a 3-year term of supervised release, restitution in the amount of $270,000, and a $250 special assessment.
 
 
 2
 Following Saia's conviction, trial counsel withdrew and Saia obtained substitute counsel. Saia's substitute counsel moved for a new trial pursuant to Fed.R.Crim.P. 33, arguing, inter alia, that Saia received ineffective assistance of trial counsel because of an actual conflict of interest arising from a fee dispute that resulted in trial counsel filing a civil action against Saia days before trial. On a motion for a new trial, the district court determined that there was no actual conflict of interest and that Saia received effective representation during his trial.
 
 
 3
 For the reasons that follow, we affirm the judgment of the district court.
 
 BACKGROUND
 
 4
 Defendant-appellant Thomas Saia was one of 27 individuals indicted by the government in connection with a conspiracy to commit wire fraud through the operation of four telemarketing operations--Grand National Products ("GNP"), Grand American Marketing, Inc. ("GAM"), Universal Promotions ("UP"), and Northtown Universal Products. In the prosecution giving rise to this appeal, Saia was named with twelve other individuals in a 110-count indictment.
 
 
 5
 In pursuit of the conspiracy, employees of these companies, using a written sales script, telephoned individuals in Canada and the United States and falsely told them they were one of 14 winners in a large awards promotion. Each person was told that he or she had won either an automobile valued at $35,000 or a large screen television worth $5000. However, the people were told that they must send some specified amount--usually between $1500 and $5000--to the company in order to receive the award. The salesperson explained either that the money was required to pay taxes, duties and other expenses, or to purchase a product.
 
 
 6
 Once an individual sent the company money, he or she often was contacted by a more experienced telemarketer, called a "reloader." The reloaders attempted to obtain more money from the individuals by telling them that they had won more valuable prizes and that additional taxes and expenses must be paid before shipment could be made.
 
 
 7
 According to the evidence adduced at trial, Saia partially owned three of the companies and managed the fourth. His responsibilities included training the sales staff, providing them with leads, and occasionally sending out small prizes instead of the promised items to people contacted by the sales staff. Trial testimony further established that Saia was aware of the misrepresentations made by the sales staff and that he complimented these staff members on their selling techniques. Testimony also established that some customers received a low-cost cleaning product, some received a television valued at less than $400, but no one received either a large screen television or an automobile.
 
 
 8
 Upon his indictment in September of 1994, Saia retained attorney Leonard Berkowitz upon payment of a fee of $2500, which was paid by Saia's family. At some point thereafter, Berkowitz realized that the retainer fee was insufficient to cover the cost of Saia's defense and, sometime in January of 1995, requested an additional $7500. Saia told Berkowitz that he could not afford to pay the additional money at that time, but said he would pay it at a later time.
 
 
 9
 On January 17, 1995, Berkowitz moved before the magistrate judge to withdraw from Saia's defense, citing strategic disagreements with Saia, Saia's failure to pay the full fee, and Saia's failure to keep appointments. The government opposed the motion because the case was ready for trial and it believed it would be prejudiced by any delay resulting from Saia's attempt to find another attorney. Saia indicated that he could obtain new counsel by February 8, 1995. The magistrate judge reserved decision on the motion and ordered Saia to appear on February 3.
 
 
 10
 When Saia appeared on February 3, he came without new counsel and instead asked for assigned counsel pursuant to the Criminal Justice Act ("CJA"), 18 U.S.C. § 3006A. Upon questioning, the magistrate judge learned that Saia had invested $15,000 in a new telemarketing company only three months earlier, expected to earn between $500 and $800 a week from this company, and had traveled to Atlanta two days earlier at his own expense. Although Saia claimed that he had borrowed the vast majority of the $15,000 investment, the magistrate judge denied Saia's request. When the magistrate said that Saia had access to sufficient funds to retain counsel, Saia stated: "I didn't say that I couldn't afford counsel. I couldn't afford the counsel that I had been talking to." (J.A. 23.) Saia did not appeal the magistrate judge's decision, nor did he request the appointment of CJA counsel by the district court.
 
 
 11
 On February 14, Saia appeared before the district court with Kenneth Farrell, Berkowitz's associate, who previously had filed motions in the case and was now lead counsel in Saia's defense.[1] At that appearance, Farrell expressed Saia's desire that Farrell continue as counsel and that Saia was satisfied with his representation. However, Farrell renewed the law firm's motion to withdraw from the case. The district court denied Farrell's motion to withdraw.
 
 
 12
 On April 13, 1995, Farrell sent Saia a letter informing him that the firm would "not incur any additional expenses for witness fees or a process server to serve any subpoena" because Saia had not paid the balance of the agreed fee. (J.A. 35.) Farrell did indicate, however, that he would attempt to contact each person listed on the witness list provided by Saia, but cautioned Saia that "there is no assurance of the appearance of any witness named in the Witness List." (Id.) Farrell in fact did attempt to contact each person and determined that all but one of the people would be harmful to the defense--a conclusion Saia shared.
 
 
 13
 On June 6, 1995, six days before the scheduled trial date, Berkowitz filed a civil suit against Saia for legal fees incurred during the pre-trial phase of the litigation. Saia did not file an answer, and default judgment was entered in the amount of $5,838.07 on July 6, 1995. A second suit was filed in July of 1995, this time relating to fees and expenses incurred for trial preparation and trial. That suit resulted in a default judgment for $10,743.77. Berkowitz explained that the civil actions were intended to protect the firm's interest.
 
 
 14
 Following a jury trial, at which 27 witnesses testified for the government, Saia was convicted on each of the five counts of the indictment in which he was named. Following Saia's conviction, attorney Michael Cleary contacted Farrell at the request of Saia's family to discuss filing a motion for Saia's release pending sentencing. Cleary testified at the hearing on Saia's new trial motion that Farrell had informed him that the firm would not file the motion because it had not been paid. Saia's brother-in-law, John Duncan, also testified that he was told that the firm would not file the motion unless it was paid additional compensation. After Duncan paid the firm $1000, Farrell filed the motion on August 10, 1995. The motion was denied by the district court on August 28, 1995.
 
 
 15
 On September 6, 1995, Farrell again moved the district court to withdraw as counsel. Also around that time, Farrell filed objections to the sentencing recommendations set forth in the presentence report. The district court later overruled those objections. On that same date, present counsel filed a notice of substitution of counsel. The government objected to the substitution, alleging a conflict of interest because a partner of present counsel's firm represented a co-defendant who earlier had pled guilty. On October 25 and 27, the district court held a hearing on the conflict issue and, on November 3, granted Farrell's motion to withdraw and permitted the substitution of counsel.
 
 
 16
 On December 13, 1995, Saia filed a motion for a new trial based upon his alleged conflict of interest with Farrell. An evidentiary hearing on the issue began on March 27 and ended on April 2, 1996. Saia, Berkowitz, Farrell, Cleary, and Duncan all testified at the hearing. On August 15, 1996, the district court denied Saia's motion, finding that there was no actual conflict of interest and that Saia had been afforded effective assistance during the trial.
 
 
 17
 Saia was sentenced on September 20, 1996. Based upon the evidence adduced at trial and the recommendations of the Probation Department, the district court found that Saia's adjusted offense level was 28 and his criminal history category was III, resulting in a guideline range of 97-121 months. In calculating Saia's adjusted offense level, the district court applied a 12-level adjustment for loss over $1.5 million, a 2-level adjustment alternatively based on more than minimal planning or more than one victim, a 4-level adjustment for leadership role in the offense, a 2-level adjustment for vulnerable victims, and a 2-level adjustment for obstruction of justice. The district court arrived at Saia's criminal history category based upon his prior New York State narcotics conviction and his lifetime-parole status at the time he committed the instant offense. Saia was sentenced principally to a 110-month term of imprisonment. This appeal followed.
 
 DISCUSSION
 I. Conflict of Interest
 
 18
 The Sixth Amendment guarantees criminal defendants effective assistance of counsel. See Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 2063-64, 80 L.Ed.2d 674 (1984). Sixth Amendment violations fall into three categories distinguished by the severity of the deprivation and the showing of prejudice required of the defendant in order to succeed on his claim. The first category encompasses circumstances so severe as to constitute per se violations of the Sixth Amendment. See Bellamy v. Cogdell, 974 F.2d 302, 306 (2d Cir.1992) (in banc). To date, we have found per se violations in only two instances: (1) where the attorney was not licensed to practice law because he failed to satisfy the substantive requirements of admission to the bar, and (2) where the attorney was implicated in the defendant's crime. See id.; see also Tippins v. Walker, 77 F.3d 682, 688-89 (2d Cir.1996) (suggesting that an attorney's sleeping through a substantial portion of the defendant's trial may constitute a per se violation). Where a defendant establishes a per se violation of his right to counsel, he need make no further showing in order to obtain relief. See United States v. Novak, 903 F.2d 883, 886 (2d Cir.1990).
 
 
 19
 The second category involves conflicts of interest between attorney and client that do not rise to the level of per se violations, but may jeopardize the adequacy of representation. See United States v. Cancilla, 725 F.2d 867, 870 (2d Cir.1984); see also Strouse v. Leonardo, 928 F.2d 548, 552 (2d Cir.1991). In order to prevail on a conflict of interest claim, the defendant must establish an actual conflict of interest that resulted in "a lapse of representation." United States v. Stantini, 85 F.3d 9, 16 (2d Cir.) (quotation omitted), cert. denied, --- U.S. ----, 117 S.Ct. 498, 136 L.Ed.2d 390 (1996); see Cuyler v. Sullivan, 446 U.S. 335, 349, 100 S.Ct. 1708, 1718-19, 64 L.Ed.2d 333 (1980); Winkler v. Keane, 7 F.3d 304, 308 (2d Cir.1993) (contingent fee in criminal case held to create an actual conflict of interest but no proof was shown that representation was adversely affected). Once a defendant demonstrates an actual conflict and a lapse in representation, prejudice is presumed. See United States v. Fulton, 5 F.3d 605, 609 (2d Cir.1993).
 
 
 20
 The third category entails ineffective assistance of counsel that is unrelated to a conflict of interest. Claims of ineffective assistance are analyzed under the familiar framework of Strickland v. Washington, which requires a defendant to show "(1) that his attorney's performance fell below an 'objective standard of reasonableness,' and (2) that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " Kieser v. New York, 56 F.3d 16, 18 (2d Cir.1995) (quoting Strickland, 466 U.S. at 688, 694, 104 S.Ct. at 2064, 2068). However, "[b]ecause of the difficulties inherent in [evaluating an attorney's performance], a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065.
 
 
 21
 In the instant case, Saia does not argue that there was a per se violation of his Sixth Amendment rights, but contends that Farrell labored under an actual conflict of interest because of Saia's failure to pay his legal fees and because of the civil actions initiated to recover those unpaid fees. However, under the circumstances of this case, neither the fee dispute itself, nor the civil actions, gave rise to an actual conflict of interest.
 
 
 22
 "There is an actual, relevant conflict of interests if, during the course of the representation, the defendants' interests do diverge with respect to a material factual or legal issue or to a course of action." Cuyler, 446 U.S. at 356 n. 3, 100 S.Ct. at 1722 n. 3 (Marshall, J., concurring in part and dissenting in part); see United States v. Malpiedi, 62 F.3d 465, 469 (2d Cir.1995). We review de novo whether the defendant has established an actual conflict of interest. See Winkler, 7 F.3d at 308 ("Whether a defendant's representation was constitutionally inadequate is a mixed question of law and fact and thus we exercise de novo review.").
 
 
 23
 In this case, Saia has failed to demonstrate a divergence in interests with Farrell. First, we never have held that failure to pay fees or an attorney's motion to withdraw for his client's failure to pay, without more, gives rise to a conflict of interest and decline the invitation to do so here. There is little question that a defendant's failure to pay fees may cause some divisiveness between attorney and client, but we presume that counsel will continue to execute his professional and ethical duty to zealously represent his client, notwithstanding the fee dispute. See United States v. DiCarlo, 575 F.2d 952, 957 (1st Cir.1978) ("[T]he presumption [is] that the lawyer will subordinate his pecuniary interests and honor his primary professional responsibility to his client[ ] in the matter at hand." (quotation omitted and second alteration in original)); United States v. Wright, 845 F.Supp. 1041, 1073 n. 35 (D.N.J.) ("[N]onpayment of legal fees ... does not establish a conflict of interest of the type which would establish ineffective assistance; lawyers are required to provide zealous advocacy regardless of a criminal defendant's failure to pay legal fees."), aff'd, 46 F.3d 1120 (3d Cir.1994) (table). To the extent that the attorney shirks his ethical obligation to dutifully represent his client as a result of a fee dispute, we believe Strickland provides the appropriate analytic framework. Cf. Beets v. Scott, 65 F.3d 1258, 1271 (5th Cir.1995) (en banc) (Strickland provides superior framework where the conflict involves attorney's self-interest rather than multiple representation), cert. denied, --- U.S. ----, 116 S.Ct. 1547, 134 L.Ed.2d 650 (1996).
 
 
 24
 Moreover, we do not think that the civil suit and attendant default judgments against Saia created a divergence of interest between Saia and trial counsel. As a practical matter, Berkowitz was less likely to receive payment if Saia was convicted. Cf. United States v. Patasnik, 89 F.3d 63, 68 (2d Cir.1996) ("[I]t is likely that [the attorney's] chances of being paid would vary inversely with the severity of [the defendant's] sentence, giving him an additional incentive to defend [the defendant] zealously."). Furthermore, the nature of the civil proceeding was such that it is highly unlikely that it engendered sufficient hostility to infect the attorney-client relationship in Saia's criminal case. The civil suits were essentially non-adversarial because Saia never contested that he still owed the fee balance and never filed any responsive pleading. Thus, we find no actual conflict of interest in Berkowitz's civil suit to recover unpaid legal fees. Cf. United States v. Burns, 990 F.2d 1426, 1438 (4th Cir.1993) (defendant's filing of a state bar grievance against his appointed counsel did not create an actual conflict of interest); Atkins v. Wright, 843 F.Supp. 457, 461 (N.D.Ind.1994) ("[A] criminal defendant cannot per se create a conflict of interest with his own attorney by suing that attorney.").
 
 
 25
 Saia contends that the district court erred by failing to inquire into the possibility of a conflict of interest upon becoming aware of the fee dispute on Farrell's motion to withdraw from representing Saia. A district court is obligated to conduct an inquiry into a potential conflict of interest when "sufficiently apprised of even the possibility" that a conflict of interest may exist. United States v. Levy, 25 F.3d 146, 153 (2d Cir.1994); see United States v. Leslie, 103 F.3d 1093, 1098 (2d Cir.), cert. denied, --- U.S. ----, 117 S.Ct. 1713, 137 L.Ed.2d 837 (1997). Where the district court fails to make such an inquiry, we have held this to be per se reversible error. See Stantini, 85 F.3d at 13; United States v. Lussier, 71 F.3d 456, 461 (2d Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1321, 134 L.Ed.2d 474 (1996).
 
 
 26
 However, the existence of a fee dispute and an attorney's motion to withdraw for that reason do not without more constitute a conflict of interest. Therefore, the district court had no duty to conduct an inquiry when presented only with a motion by Saia's counsel to withdraw for non-payment of fees.
 
 II. Ineffective Assistance of Counsel
 
 27
 There being no conflict of interest in this case, we will vacate Saia's conviction on Sixth Amendment grounds only if he can show ineffective assistance of counsel within the meaning of Strickland. See Strickland, 466 U.S. at 693, 104 S.Ct. at 2067-68. Saia identifies several areas in which he claims to have received ineffective assistance. In particular, he contends that Farrell (1) failed to object to arguably improper questions by the government; (2) failed to conduct an effective cross-examination of the government's cooperating witnesses; (3) refused to subpoena potential witnesses; and (4) failed to adequately represent him during the sentencing phase.[2] We need not address whether these instances amounted to inadequate representation, because Saia fails to show even a reasonable probability that any of the allegedly inadequate representation would have altered the outcome of his trial or his sentencing. See id. at 697, 104 S.Ct. at 2069 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.").
 
 
 28
 Overwhelming evidence of Saia's guilt was adduced at trial. See United States v. Hurtado, 47 F.3d 577, 584 (2d Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 266, 133 L.Ed.2d 188 (1995). The government presented 27 witnesses, 15 of whom had worked directly with Saia and implicated him in the conspiracy. Sales personnel testified that Saia was aware of the misrepresentations made to the victims and, in fact, applauded them on their skill in making those misrepresentations. Secretaries who worked for Saia testified that he unplugged phone lines to prevent phone calls from disgruntled customers and that he never authorized the shipment of any of the promised awards. The evidence adduced at trial leaves no doubt that Saia was a major participant in this criminal conspiracy.
 
 
 29
 In the face of the overwhelming evidence against him, Saia cannot show that there is a reasonable probability that, but for the alleged trial errors, the outcome of the trial would have been different. See Kieser, 56 F.3d at 18. Saia argues that Farrell should have objected more frequently to questions put to the witnesses by the government. However, he fails to identify any particularly damning evidence that could have been kept out of the trial had Farrell objected, or even to articulate how the outcome of the trial might have differed had Farrell objected more vigorously. See United States v. Weiss, 930 F.2d 185, 199 (2d Cir.1991) (speculative claims concerning an error's impact are insufficient to establish prejudice).
 
 
 30
 Likewise, Saia does not show prejudice from Farrell's failure to inquire on cross-examination into the extent to which each cooperating witness's sentence was to be reduced by cooperating with the government. Farrell did bring the witnesses' expectations of leniency to the attention of the jury and there is no reason to believe that further cross-examination would have had any more than a negligible effect on the jury's verdict. See Routly v. Singletary, 33 F.3d 1279, 1289 (11th Cir.1994) (no prejudice where attorney sufficiently illuminated any potential bias or motivation for testifying).
 
 
 31
 Saia also fails to establish that the outcome of his trial might have been different if Farrell had not notified him that he would not subpoena any witnesses because of Saia's failure to pay the balance of the fee then due. Despite his statement, Farrell attempted to contact each witness on Saia's witness list and made determinations as to whether the prospective witnesses would be helpful to Saia's defense. After conducting his investigation, Farrell concluded, and Saia agreed, that only one witness advanced Saia's cause, and that witness did testify at trial. Thus, Farrell in fact did investigate each potential witness available to him and no witness failed to appear because of Farrell's refusal to issue a subpoena. Therefore, Saia was not prejudiced by Farrell's conduct. See United States v. Torres, 719 F.2d 549, 556 (2d Cir.1983) (no prejudice if unsubpoenaed witnesses would not advance the defense).
 
 
 32
 Finally, Saia does not show that Farrell's failure to raise certain objections to the presentence report was likely to have affected the outcome of his sentencing.[3] As we discuss infra, the objections Saia contends should have been raised by Farrell are without merit and therefore would not have altered his sentence. See Hooper v. United States, 112 F.3d 83, 87 (2d Cir.1997). Accordingly, Saia does not satisfy the prejudice prong of the Strickland analysis and the district court properly rejected his ineffective assistance claim.
 
 III. Appointment of CJA Counsel
 
 33
 Saia next argues that the magistrate judge erred in denying his request for the appointment of counsel pursuant to the CJA. The CJA requires that counsel be furnished "for any person financially unable to obtain adequate representation." 18 U.S.C. § 3006A(a). When requesting the appointment of counsel, the burden is on the defendant to show that he is unable to afford representation, though he need not prove that he is indigent. See United States v. Harris, 707 F.2d 653, 660 (2d Cir.1983). We review the court's findings regarding ability to pay for clear error. See id.
 
 
 34
 The magistrate judge's determination that Saia was ineligible for CJA counsel is well supported by the record. When questioned by the magistrate judge about his financial circumstances at the time of his application, Saia stated that (1) in the preceding three months, he had invested $15,000--the majority of which was borrowed--in a new telemarketing business; (2) he expected to earn between $500 and $800 dollars per week from this business; and (3) he had attended a business meeting in Atlanta, Georgia, two days earlier at his own expense. Moreover, after the magistrate judge delivered his decision not to appoint counsel, Saia explained: "I didn't say that I couldn't afford counsel. I couldn't afford the counsel that I had been talking to." (J.A. 23.) Given this admission and Saia's ability to garner financial resources to engage in new business enterprises, the magistrate judge's finding that Saia was not eligible for appointed counsel was not clearly erroneous.
 
 IV. Sentencing Issues
 
 35
 Saia raises a number of issues relating to his sentencing. Notwithstanding the district court's failure to rule on all of these objections,[4] we find Saia's contentions to be without merit.
 
 A. Loss Calculation
 
 36
 Saia first argues that the district court erred in attributing to him the enterprise-wide loss, which totalled approximately $2 million. In particular, he contends that the $2 million figure was not supported by trial evidence and that the method of loss calculation employed with respect to those co-conspirators who pled guilty differed from the method applied to his loss calculation.
 
 
 37
 Sentences for offenses involving fraud are imposed under U.S.S.G. § 2F1.1(b), which requires the base offense level to be predicated on the higher of the actual loss or intended loss from the offense. See U.S.S.G. § 2F1.1, comment. (n.7); see also United States v. Studley, 47 F.3d 569, 573 (2d Cir.1995). "[I]n the case of a jointly undertaken criminal activity ..., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity" are taken into consideration in calculating the amount of loss attributable to the defendant. U.S.S.G. § 1B1.3(a)(1)(B); see Studley, 47 F.3d at 573. A district court must make particularized findings of both the foreseeability of the loss as well as the scope of the criminal activity agreed upon by the defendant. See Studley, 47 F.3d at 574.
 
 
 38
 Here, the district court calculated the loss from the entire scheme to be approximately $2 million. The court arrived at this number based upon victims' checks and the business records of the various companies involved. The district court found that all of the monies received by the businesses constituted loss, because every person who sent monies to these companies was defrauded--each person was told he would receive a gift worth at least $5000 and no one did. This conclusion was amply supported by the testimony of secretaries who worked for Saia, as well as by the testimony of numerous other employees involved in the fraud.
 
 
 39
 Moreover, the district court's conclusion that the entire loss was foreseeable to Saia is well substantiated in the record. Saia owned three of the four companies and was the manager of the fourth, was responsible for obtaining leads and sending out gifts, and was aware of the misrepresentations made by the sales staff to the scheme's victims. Thus, based upon the evidence adduced at trial, we find no error in the district court's loss calculation.
 
 
 40
 Saia also contends that the district court impermissibly double counted his role in the offense by noting his "vital role" in the conspiracy in making its foreseeability determination. However, we permit separate enhancement where "they reflect[ ] different facets of the defendant's conduct," United States v. Carrozzella, 105 F.3d 796, 801 n. 1 (2d Cir.1997) (quotation omitted and alteration in original), which is the case with the enhancement for loss and the enhancement for role, see United States v. Lilly, 13 F.3d 15, 19 (1st Cir.1994) (loss "measur[es] the gravity of the offense," while the role adjustment "measur[es] the culpability of a defendant's conduct in the commission of the offense"). Thus, the district court did not impermissibly double count Saia's role in the offense.
 
 
 41
 Saia further argues that it was improper to base the loss attributable to him on the proceeds of the entire scheme, while allegedly equally culpable co-defendants who pled guilty had their loss calculations based upon their personal gain. This disparate treatment, Saia contends, amounted to punishing him for going to trial. However, we have recognized that where some co-defendants plead guilty and others go to trial, sentencing disparity may well occur because the "relevant sentencing information available to the judge after [a] plea will usually be considerably less than that available after a trial." United States v. Perez, 904 F.2d 142, 147 (2d Cir.1990) (quotation omitted and alteration in original). Here, the district court almost certainly had much less evidence for each co-defendant as to the scope of the criminal activity agreed upon and the foreseeability of the whole loss than it would have had after a trial. To ensure that the sentence rested on a factual basis, the district court might have justifiably used personal gain to calculate loss. Evidence at Saia's trial, however, clearly established that Saia participated in all aspects of the conspiracy and that the entire loss was foreseeable to him. Thus, the district court's choice of method for calculating the loss attributable to Saia was not improper.
 
 B. Vulnerable Victims
 
 42
 Saia next contends that the district court erred in applying a two-level adjustment for targeting unusually vulnerable victims, pursuant to U.S.S.G. § 3A1.1(b). Specifically, he argues that the victims in this case were not "unusually vulnerable."
 
 
 43
 3A1.1(b) provides for a two-level adjustment "[i]f the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct." In determining vulnerability, we focus not on the likelihood or extent of harm to the individual if the crime is successful, but on the extent of the individual's ability to protect himself from the crime. See United States v. Kaye, 23 F.3d 50, 54 (2d Cir.1994).
 
 
 44
 The trial record reflects that the victims of this scheme primarily were individuals in their sixties, seventies and eighties. Although being elderly is alone insufficient to render an individual "unusually vulnerable" within the meaning of 3A1.1(b), see United States v. Blake, 81 F.3d 498, 504 (4th Cir.1996), courts frequently have found elderly individuals to be unusually vulnerable to telemarketing fraud schemes very similar to the one involved here, see, e.g., United States v. Cron, 71 F.3d 312, 314 (8th Cir.1995); United States v. Leonard, 61 F.3d 1181, 1188 (5th Cir.1995). Moreover, trial testimony revealed that many of the leads given to the sales staff were the names and phone numbers of individuals who previously had done business with a telemarketing company, indicating their susceptibility to criminal conduct that utilizes telemarketing methods. Finally, an important part of the scheme was the re-loading process, whereby individuals who already had been victimized by the scheme were contacted up to two more times and defrauded into sending more money to the companies. Based on this record, the district court properly adjusted Saia's offense level pursuant to 3A1.1(b).
 
 C. Saia's Parole Status
 
 45
 Saia further argues that the district court erred in adding two criminal history points to his criminal history calculation for committing the offense while on lifetime parole, pursuant to U.S.S.G. § 4A1.1(d). Specifically, Saia contends that, although he had been placed on lifetime parole in New York, he was discharged from parole in Nevada. His parole obligation had been transferred to Nevada, where he resided for some time following his release from prison in New York. However, Saia was unable to present any evidence of his discharge beyond his mere say-so, and it is doubtful whether Nevada could have discharged him in any event. We think that, once the government established that Saia had been placed on lifetime parole, it was his burden to prove that he had been discharged from parole. Saia has failed to carry the burden. The district court properly found that Saia was on lifetime parole at the time he committed the instant offense. See United States v. Ibanez, 924 F.2d 427, 430 (2d Cir.1991) (no clear error where district court did not credit defendant's unsubstantiated assertion that he was not on probation).
 
 D. Remaining Contentions
 
 46
 Saia raises three additional arguments that merit only brief discussion. First, he contends that the district court impermissibly double counted his leadership role in the offense in grounding a two-level adjustment under 2F1.1(b)(2) on more than minimal planning. This argument is meritless, because the district court relied on factors beyond Saia's role in the offense in applying the planning adjustment and therefore did not engage in impermissible double counting. See United States v. Greenfield, 44 F.3d 1141, 1146 (2d Cir.1995).
 
 
 47
 Second, Saia argues that the district court erred in alternatively grounding the 2F1.1(b)(2) enhancement on there being more than one victim, because the enhancement double counted the numerousness of the victims, which already was taken into consideration by attributing the entirety of the loss to him under 2F1.1(b)(1). This contention is also without merit, because these two guidelines address two "different facets of the defendant's conduct" and thus do not constitute impermissible double counting. Carrozzella, 105 F.3d at 801 n. 1 (quotation omitted).
 
 
 48
 Saia's final argument is that the district court erred in applying a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1, because the enhancement was unsupported in the record. However, material elements of Saia's trial testimony were directly contradicted by several witnesses, and evidence was presented that Saia attempted to influence the testimony of two potential witnesses. Based upon these findings, the district court properly applied the obstruction of justice adjustment to Saia. See U.S.S.G. § 3C1.1, comment. (n.3(a), (b)).
 
 CONCLUSION
 
 49
 For the foregoing reasons, the judgment of the district court is affirmed.
 
 
 
 *
 The Honorable Milton I. Shadur of the United States District Court for the Northern District of Illinois, sitting by designation
 
 
 [1]
 Berkowitz testified at the hearing on the new trial motion that the decision to have Farrell take over the case was influenced by the fact that Saia had not paid the retainer fee
 
 
 [2]
 Saia also argues that he received ineffective assistance because of Farrell's inexperience. However, inexperience alone does not constitute ineffective assistance absent specific instances of deficient conduct. See United States v. Cronic, 466 U.S. 648, 665, 104 S.Ct. 2039, 2050, 80 L.Ed.2d 657 (1984)
 
 
 [3]
 Saia also contends that Farrell should have been present during his presentence interview with the Probation Department. However, even assuming that the Sixth Amendment is applicable to a presentence interview, see United States v. Cortes, 922 F.2d 123, 127-28 (2d Cir.1990) (declining to determine whether defendant had a right to counsel at his presentence interview), Saia does not show any prejudice from Farrell's absence. Saia simply argues that Farrell should have been there to prevent him from putting "his foot in his mouth," (Appellant's Br. at 54), but does not indicate how Farrell's presence could have altered the outcome of the sentencing proceeding
 
 
 [4]
 In October of 1995, present counsel raised objections to the presentence report not raised by Farrell. The district court did not permit the filing of these objections, reasoning that Saia was not entitled to a "second bite of the apple." (J.A. 737.) The district court did permit counsel to express his objections on the record and the government does not argue that we are precluded from addressing these issues by the fact that the district court did not adjudicate them