10-3630-pr
Gonzalez v. USA

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2011

(Argued: January 26, 2012          Decided:     July 10, 2013 )

Docket No. 10-3630-pr

_____

PEDRO GONZALEZ,

Petitioner-Appellant,

- v. -

UNITED STATES OF AMERICA,

Respondent-Appellee.
_____

Before:  KEARSE, CABRANES, and SACK, Circuit Judges.

Appeal from an order of the United States District Court for the Northern District of New York, Thomas J. McAvoy, Judge, denying motion pursuant to 28 U.S.C. § 2255 to vacate judgment or sentence on the ground of ineffective assistance of counsel in connection with plea of guilty and sentencing.

Order vacated; matter remanded for resentencing.

MOLLY K. CORBETT, Albany, New York (Lisa A. Peebles, Acting Federal Public Defender for the Northern District of New York, Albany, New York, on the brief), for Petitioner-Appellant.

PAUL D. SILVER, Assistant United States Attorney, Albany, New York (Richard S. Hartunian, United States Attorney for the Northern District of New York, Albany, New York, on the brief), for Respondent-Appellee .

KEARSE, Circuit Judge:

Petitioner Pedro Gonzalez, who was convicted in 2001, on his plea of guilty, of narcotics and bribery crimes and sentenced principally to 210 months of imprisonment, appeals from an order of the United States District Court for the Northern District of New York, Thomas J. McAvoy, Judge, denying his 2009 motion pursuant to 28 U.S.C. § 2255 to vacate his conviction and sentence on the ground that his attorney provided ineffective assistance in connection with both the plea of guilty and sentencing. The district court denied the motion, ruling that Gonzalez failed to show that his attorney's deficient performance caused him prejudice. On appeal, Gonzalez contends that the district court erred in its no-prejudice ruling and abused its discretion in determining the issues without ordering discovery or conducting an evidentiary hearing. For the reasons that follow, we vacate the order denying the § 2255 motion; we remand for the district court to vacate the sentence and to resentence Gonzalez, with Gonzalez represented by competent counsel.

I. BACKGROUND

This appeal comes to us after a tortuous path encompassing Gonzalez's indictment in 2000; his plea of guilty and attempts to withdraw that plea in 2001; the ensuing 2001 judgment of conviction which--following a first § 2255 motion that was ultimately successful after Gonzalez's trial-level attorney had been disbarred--was vacated and reentered in 2007; this Court's 2008 affirmance of the conviction and the reimposed sentence, accompanied by our grant of permission to file a second--the present--§ 2255 motion asserting ineffective assistance of counsel in connection with the plea of guilty and sentencing; the filing of the present § 2255 motion in 2009; the district

court's denial of that motion in 2010; and this Court's grant in 2011 of a certificate of appealability permitting Gonzalez to appeal that denial. The record shows the following.

A. The Proceedings in 2000-2008

Following an undercover operation in 1999-2000, conducted jointly by federal and New York State law enforcement agencies concerned with narcotics trafficking and immigration matters, Gonzalez was one of some three dozen individuals indicted in 2000. He was named in 32 counts charging him with, inter alia, distributing and possessing with intent to distribute various quantities of cocaine and heroin, conspiring to traffic in more than one kilogram of heroin and more than five kilograms of cocaine, and conspiring to use drugs and cash to bribe a supposedly corrupt Immigration and Naturalization Service ("INS") official to provide certain aliens with documents evidencing Permanent Resident Alien status (also known as "green cards"). Gonzalez was arraigned in July 2000 and pleaded not guilty. His retained attorney was Carlos Perez Olivo ("Perez-Olivo").

Following his arraignment, Gonzalez attended proffer sessions with government prosecutors and law enforcement agents. The prosecutors sought information about the involvement of codefendant Gabriel Ceballos, who was accused of being one of Gonzalez's drug suppliers, see generally United States v. Ceballos, 340 F.3d 115, 118-22 (2d Cir. 2003); see id. at 130, 123 (reversing Ceballos's bribery conspiracy conviction and noting that Ceballos had not challenged his narcotics conspiracy conviction). Gonzalez hoped to reach a plea agreement to limit his offenses of conviction and to have the government move pursuant to § 5K1.1 of the Sentencing Guidelines (or "Guidelines"), which were then considered mandatory, for a reduced sentence for his offenses.

3

Both sides' aspirations were largely unfulfilled. The government found Gonzalez's statements in the proffer sessions to be unhelpful, and it ultimately did not agree to make a § 5K1.1 motion. The parties entered into a plea agreement dated January 10, 2001 ("Plea Agreement" or "Agreement"), in which Gonzalez agreed to plead guilty to eight counts of the indictment--Counts I through VIII--to wit, both of the above conspiracy counts, one count of cocaine distribution, and five counts of heroin distribution. (See Plea Agreement at 1-2.) The Agreement provided that the government would dismiss the other 24 counts against Gonzalez (see id. at 9-10), but that if his plea were withdrawn, the government could reinstate and pursue any of those 24 counts as to which the statute of limitations had not run as of the date of the Agreement (see id. at 10).

In the Agreement, Gonzalez admitted, inter alia, that he had knowingly and intentionally possessed with intent to distribute approximately 4,125 grams of cocaine and approximately 2,239 grams of heroin. (See id. at 7.) The Agreement stated that his plea of guilty would expose him to various penalties, including a maximum of life imprisonment for the narcotics conspiracy and a maximum of 40 years' imprisonment for four of the substantive narcotics offenses. (See id. at 2-5.) Gonzalez agreed, inter alia, not to appeal a sentence of imprisonment of 235 months or less. (See id. at 14.)

On January 10, 2001, the day the Plea Agreement was signed, Gonzalez changed his plea on Counts I through VIII of the indictment from not guilty to guilty (see Plea Hearing Transcript, January 10, 2001 ("Plea Tr."), 10-13, 25). In response to questioning by the district court, Gonzalez stated under oath that he was pleading guilty voluntarily, that no one had made any promises to him as to lenient treatment other than as indicated in the Plea Agreement, and that he had received no threats of "a use of force to induce [him] to plead guilty." (Id. at 16.) He also stated that he had

4

spoken with Perez-Olivo "about [his] chances of winning or losing if [he] went to trial, trial strategy and defenses" (id. at 8-9), and that he was satisfied with what Perez-Olivo "ha[d] done for [him] so far" (id. at 16). Gonzalez asked whether he could address the court to "explain [his] situation"; Perez-Olivo said he had advised Gonzalez that Gonzalez could instead speak at sentencing; the court endorsed that and stated that it would be happy at the plea hearing to answer any of Gonzalez's questions. (See id. at 15-16.)

The Assistant United States Attorney ("AUSA") then recounted at length (see id. at 17-21) the government's evidence that Gonzalez had, inter alia, made deliveries of cocaine or heroin on specific dates, and that Gonzalez "trafficked in over four kilograms of cocaine[,] . . . negotiated to produce over ten kilograms of cocaine, and . . . produced over two kilograms of heroin throughout the course of this conspiracy, which lasted from approximately June of 1999 to June of 2000" (id. at 18-19). When the court asked Gonzalez, "Is that what you, in fact, did?" Gonzalez answered, "Yes, your Honor." (Id. at 21.)

Although the Plea Agreement had not included an estimate of the Guidelines-recommended range of imprisonment for the offenses to which Gonzalez was pleading guilty, the AUSA estimated at the plea hearing that if there were no applicable adjustments, such as for acceptance of responsibility, the prescribed range of imprisonment would be 262 to 327 months (see id. at 23).

1. <u>Gonzalez's Attempt To Withdraw His Plea of Guilty</u>

In May 2001, the Probation Department sent its proposed presentence report ("PSR") to the government and Perez-Olivo. Sometime thereafter, but before the then-scheduled October 2001 sentencing date, Gonzalez wrote to the probation officer to request a copy of the PSR, stating that neither he nor his wife had been able to reach Perez-Olivo since January; Gonzalez stated that Perez-Olivo was never at his office when Gonzalez's wife attempted to see him and that Perez-Olivo never returned her telephone calls. Gonzalez also asked the probation officer to forward to the court an enclosed letter.

Gonzalez's letter to the court stated that although Gonzalez bore some responsibility for his actions, he had been drawn into the immigration scheme believing it was lawful and that after he had begun participating he was blackmailed and coerced to continue. (<u>See</u> undated Letter from Pedro Gonzalez to "Your Honor" ("Gonzalez 2001 Letter to the Court") at 1.) The letter stated in part as follows:

> I am not saying that I'm not guilty, I do have my responsibility in this case. Everything started when one of my workers brought a friend to the construction site. I am a general contractor, I have my own crew of employees. A man by the name of Jose Manuel called my house a few weeks later and told me that he had something that can help my workers. Upon meeting with him he told me he had an imigration [sic] lawyer that can provide permanent resident status in the U.S. Mr. Manuel assured me that everything was legal and the fee that would be charged was for his honorariums and the speedy process of the paperwork. Since some of my workers need the green cards to be legal residents in this country, I agreed to help them. If I thought anything was illegal or would jeopardize anyone I would never had [sic] agreed to any of it. After a few people, including my brother-in-law, supplied their passports and paid two thirds of the fee, Mr. Manuel brought us to a restaraunt [sic] in Albany. We were introduced to three people that he claimed worked for the imigration [sic] lawyer. From that moment on I was pushed around, set up, blackmailed, extorted, threatened and used. In all reality, they

6

forced me to do what they wanted me to do. I was afraid for the lives of my children, my wife and all the people applying for the green cards some of who [sic] were also threatened.

(Id.)

At Gonzalez's sentencing hearing, Perez-Olivo told the court that, some days earlier, Gonzalez had informed him that Gonzalez "wishe[d] to withdraw his plea of guilty because it was not voluntary in the sense that . . . he was threatened by the agents." (Sentencing Transcript, November 13, 2001 ("S.Tr."), 3.) Perez-Olivo stated that Gonzalez said "that, yes, he committed certain acts, but it was under duress" (id. at 4); "that he doesn't feel that he's guilty, that he feels that he was coerced and threatened" (id. at 5); "[a]nd that the only reason he waited until now to inform me or anybody else is because he was concerned for himself and his family. He has discussed it with his family after the presentence report came back with the recommendations and the fact that there would be no 5K1 letter forth[]coming" (id.). Gonzalez clarified that he was asserting that during the events leading to his arrest he had been coerced by someone--who he said turned out to be a government informant--to make payments to men he later learned were undercover law enforcement agents:

THE DEFENDANT: . . . [The informant] called me and told me if I did not get the drugs for him, they were going to kill me, and he spoke about the . . . the ones who were in charge of collecting money, of the company. After that, I realize, when they brought me to court, that these gentlemen are agents, because I saw them here.

(Id. at 10; see also id. at 15-16 ("the threats that they have for my life were before I was arrested").)

Gonzalez stated that after he was arrested but "before [he] pled guilty" (S.Tr. 15), one of the undercover agents, called "Danilo," told him at an interview session--when Perez-Olivo was

not present--that if Gonzalez "did not cooperate properly, they were going to condemn [Gonzalez] to 30 years" (id. at 14). The AUSA informed the court that Gonzalez had been debriefed by the government both prior to and after his plea of guilty (see id. at 16-17) but that the AUSA was not aware of any threats at those sessions (see id. at 11). The court quizzed Gonzalez as to the threat he alleged was made by the agent:

THE COURT: . . . . So, you say Danilo told you if you didn't plead guilty, you were gonna get a higher sentence?

THE DEFENDANT: Yes.

THE COURT: And that's the threat that you're basing your motion on?

THE DEFENDANT: That was the threat that he gave to me when I was arrested already, yes. So, I should plead guilty and I should not go to trial because they were going to hang me. And the threats that they have for my life were before I was arrested. . . .

. . . .

THE COURT: And when you appeared before me, I asked ya if anybody had made any threats or promises, and you told me no. Were you lying to me then?

THE DEFENDANT: Supposedly [sic]. I have never been in situation like this and this is something that put me completely nervous, and I always was under the threat of those people, and I only was thinking [sic] my children.

(Id. at 15-16; see also id. at 21 ("I was not really understanding anything that was happening here").)

The district court denied Gonzalez's motion to withdraw his plea of guilty. The court noted that it had received Gonzalez's pro se letter--forwarded by the probation officer--"where he refers to threats, being pushed around and blackmailed," but the court noted that that letter had not said anything about "threats from an agent" (S.Tr. 13) and that the allegations about "Danilo" were

belated and unsubstantiated (see id. at 17). The court also stated that "the fact that somebody may have said if you don't plea, you're gonna get a higher sentence" was not a sufficient ground for the court to allow the plea to be withdrawn. (Id.)

The PSR on Gonzalez stated that Gonzalez had knowingly and intentionally distributed and possessed with intent to distribute approximately 4,125 grams of cocaine and 2,239 grams of heroin, and it detailed dates on which and places to which Gonzalez had delivered specified quantities of those substances to undercover law enforcement agents. The PSR also stated, inter alia, that Gonzalez had transported illegal aliens to various locations for the purpose of obtaining illegal green cards from a supposedly corrupt INS official, who was in fact an undercover INS agent, and that Gonzalez had delivered the narcotics as payment for the cards. The PSR stated that Gonzalez's total Guidelines offense level was 35 and his criminal history category was III, making the Guidelines-recommended range of imprisonment 210-262 months.

Gonzalez and the government stated that they had no objections to the factual contents of the PSR, and the court adopted those contents. (See S.Tr. 18.) After a two-sentence statement from Perez-Olivo urging that the court order imprisonment at the low end of the Guidelines range, and a lengthier statement by Gonzalez reiterating that his conduct had been coerced and was not knowingly illegal, the court imposed, inter alia, a prison term of 210 months. (See id. at 18-22.)

2. Gonzalez's First § 2255 Motion, in Pursuit of an Appeal

In January 2003, represented by new counsel, Gonzalez filed his first § 2255 motion in this matter; he requested that his sentence be vacated on the ground of ineffective assistance of

9

counsel because Perez-Olivo had failed to file an appeal as requested by Gonzalez. In support of this motion, Gonzalez submitted, inter alia, an affidavit stating principally that immediately after being sentenced on November 13, 2001, he had informed Perez-Olivo that he wanted to appeal to challenge the denial of his motion to withdraw his plea of guilty; that that was the last date on which he had had any contact with Perez-Olivo; that Gonzalez's wife and son (who provided supporting affidavits) had made numerous inquiries of Perez-Olivo with regard to Gonzalez's appeal and had received assurances from Perez-Olivo that the appeal was going well; and that Gonzalez eventually learned that in fact Perez-Olivo had never filed an appeal. (See Affidavit of Pedro Gonzalez dated November 20, 2002 ("Gonzalez 2002 Aff.").)

The district court denied Gonzalez's § 2255 motion on the ground that it was procedurally barred by Gonzalez's appeal waiver in the Plea Agreement. See Decision and Order dated June 19, 2003 ("June 2003 Order" or "Gonzalez I"), at 4. Gonzalez had agreed not to appeal his sentence if his prison term was less than 235 months; he was sentenced to 210 months' imprisonment; and the court found that he had proffered no reason for the court not to enforce that appeal waiver, see id. at 5-6.

Gonzalez sought to appeal the June 2003 Order. This Court granted a limited certificate of appealability and remanded for further consideration. On remand, the district court instructed Gonzalez to make an additional submission with respect to his allegation that he had requested Perez-Olivo to file an appeal; it ordered the government to respond and to provide any factual rebutting affidavits. Gonzalez provided a sworn declaration detailing his discussions with Perez-Olivo, his request that Perez-Olivo file an appeal, and Perez-Olivo's assurances that he had filed

an appeal. (<u>See</u> Declaration of Pedro Gonzalez dated August 18, 2004 ("Gonzalez 2004 Decl.").) The government, in opposition, submitted, <u>inter alia</u>, a 13-paragraph affidavit from Perez-Olivo, stating at length that he had not been paid (<u>see</u> Affidavit of Carlos Perez-Olivo dated September 28, 2004 ("Perez-Olivo Aff."), ¶¶ 1-9), and, far more briefly, that Gonzalez had told Perez-Olivo that Gonzalez did not wish to appeal (<u>see</u> <u>id</u>. ¶ 12).

In a Decision and Order dated February 24, 2006 ("<u>Gonzalez II</u>"), the district court found Perez-Olivo's affidavit to be credible and thus adhered to its 2003 decision in <u>Gonzalez I</u> denying Gonzalez's § 2255 motion.

### 3. <u>Perez-Olivo's Disbarment and Gonzalez's Resentencing</u>

This Court granted Gonzalez a certificate of appealability for review of <u>Gonzalez II</u> on the issue of whether the district court properly decided the factual question--<u>i.e.</u>, whether Gonzalez asked Perez-Olivo to file a notice of appeal--solely on the basis of affidavits. Before that appeal could be heard, however, Perez-Olivo was disbarred in the State of New York, <u>see</u> <u>Matter of Perez-Olivo</u>, 33 A.D.3d 141, 820 N.Y.S.2d 14 (1st Dep't 2006).

The New York court found that Perez-Olivo had previously, <u>inter alia</u>, "misrepresent[ed] to a vulnerable client that her appeal was frivolous" and had "induc[ed] her to withdraw her appeal <u>which had already been dismissed due to [Perez-Olivo's] default</u>," <u>id</u>. at 143, 820 N.Y.S.2d at 15 (emphasis added); "<u>fail[ed] to file a brief</u> with the Second Circuit and, thereafter, misrepresent[ed] to his client that her appeal was meritless," <u>id</u>. (emphasis added); "converted bail money belonging to the defendant's family to his own use," <u>id</u>. at 145, 820 N.Y.S.2d at 16; and

"engaged in conduct adversely reflecting upon [Perez-Olivo's] fitness as a lawyer," id. at 146, 820 N.Y.S.2d at 17. The Appellate Division also noted that Perez-Olivo had been "admonished in 1998 for similar misconduct" and that he had "forfeited his license to practice law in Puerto Rico at a time when he was facing disciplinary charges based upon allegations similar to those raised here." Id.

The parties in this Court thereafter stipulated that Gonzalez's case should be remanded to the district court in light of the fact of--and the foundations for--Perez-Olivo's disbarment. By order dated November 16, 2006, we "So-Ordered" the stipulation "to allow the district court to . . . conduct such further proceedings as it may deem appropriate in the circumstances."

On remand, the district court, upon further consideration and without additional proceedings, granted Gonzalez's § 2255 motion, stating as follows:

> In light of the allegations resulting in Mr. Perez-Olivo's disbarment (which include, among other things, taking money from clients for work not performed and missing appellate deadlines and then convincing his clients not to appeal) and the affidavits submitted by Petitioner in connection with his motion, the Court hereby GRANTS Petitioner's motion.

> Accordingly, Petitioner's sentence is hereby VACATED on the ground of counsel's failure to file a notice of appeal as requested by Petitioner (ineffective assistance of counsel). Petitioner is hereby resentenced to the same terms as his previous sentence, thereby providing Petitioner with an opportunity to appeal his sentence.

Decision and Order dated February 8, 2007 ("Gonzalez III"), at 2.


4. The Affirmance of Gonzalez's Convictions on Direct Appeal

On his direct appeal, Gonzalez principally argued that he should be allowed to withdraw his plea of guilty--or at least that he was entitled to be resentenced--because he had received

ineffective assistance of counsel. He argued that Perez-Olivo had, inter alia, failed to investigate the facts surrounding Gonzalez's involvement in the drugs-for-green-cards conspiracy and hence failed to assess fully the ability to defend the case; failed to assist Gonzalez in securing a § 5K1.1 motion; failed to inform Gonzalez properly of the impact of a plea of guilty; and failed to assist Gonzalez in moving for the withdrawal of his guilty plea. Gonzalez argued that although he had told Perez-Olivo before sentencing that he wanted to withdraw the plea of guilty, Perez-Olivo did not meet with Gonzalez to discuss that desire, did not move to delay the sentencing, did not file a motion to withdraw the plea, did not accurately or adequately explain to the court at the sentencing hearing the basis for Gonzalez's desire to withdraw his plea, and acted more as an ally of the government than as an advocate for Gonzalez.

Gonzalez also argued that Perez-Olivo had failed to render any assistance with respect to sentencing: Perez-Olivo, inter alia, did not file a sentencing memorandum in response to the PSR; did not respond to the government's sentencing memorandum; and, although the PSR had been circulated in May, did not meet with Gonzalez to discuss the PSR until the day of sentencing in November. Perez-Olivo also did not argue to the court that there was a coercion basis for a downward departure from the recommended Guidelines range of imprisonment, as envisioned by the provision that such a departure may be granted "[i]f the defendant committed the offense because of serious coercion, blackmail or duress, under circumstances not amounting to a complete defense," Guidelines § 5K2.12. Nor did Perez-Olivo suggest a horizontal departure from Gonzalez's calculated criminal history category of III, notwithstanding the facts that Gonzalez's only prior convictions were two for drunk driving, that he was an older man who had conducted a licensed business in the United States

for more than a decade, and that until he was contacted by the government's confidential informant in 1999 Gonzalez had had no involvement with drugs.

In November 2008, this Court summarily affirmed Gonzalez's convictions. See United States v. Gonzalez, 300 Fed. App'x 39 (2d Cir. 2008) ("Gonzalez IV"). Although we noted that a pre-sentencing motion for withdrawal of a plea of guilty may be granted if "withdrawal would be fair and just," id. at 40 (citing Fed. R. Crim. P. 11(d)(2)(B) and cases interpreting the Rule), we observed that Gonzalez did not move to withdraw the plea until 10 months after its entry; that "his motion closely followed the revelation that the government would not be providing him with a 5K1.1 letter"; that he did not offer any corroboration for his assertions that he had been coerced to engage in drug trafficking and immigration fraud or that his plea had been induced by the threats of federal agents; and that his claims of coercion contradicted statements he made under oath at his plea hearing, Gonzalez IV, 300 Fed. App'x at 41. We concluded that, "[t]o the extent that Gonzalez's plea withdrawal argument stands apart from his ineffective assistance of counsel claim," the district court did not abuse its discretion in denying Gonzalez's motion to withdraw the plea "on the basis of the record at the time the District Court ruled." Id. We declined to reach Gonzalez's claims of ineffective assistance of counsel ("IAC") because the record as to those claims was not sufficiently developed. See id.

Gonzalez did not petition for certiorari, and his conviction became final in February 2009.

B.  The Present § 2255 Motion

In Gonzalez IV, we stated that Gonzalez's IAC claims would be more appropriately addressed, in the first instance, in a collateral proceeding under § 2255 before the district court where the record could be augmented. See 300 Fed. App'x at 41.  Because Gonzalez had already been forced to file a § 2255 motion in order to pursue the direct appeal from his conviction, we construed his IAC claims as a motion to file a successive § 2255 motion, see 28 U.S.C. § 2244(b)(3)(A), asserting those claims.  We stated that "[i]n view of the existence of facts, not previously available, that might relate to the performance of counsel (including those that might bear on counsel's effectiveness at the time of Gonzalez's guilty plea)," Gonzalez would be allowed to file a second § 2255 motion.  Gonzalez IV, 300 Fed. App'x at 41.

Gonzalez filed his second § 2255 motion in 2009 (the "present § 2255 motion" or "2009 § 2255 Motion").  The motion itself, signed by counsel and containing both factual assertions and legal arguments, asserted that Perez-Olivo had provided ineffective assistance at both the pre-plea and sentencing phases and that Perez-Olivo's professional and personal history revealed a pattern of deceitful conduct, malfeasance, and ineffective assistance.  The motion also drew the court's attention to the new fact that in 2008, Perez-Olivo was convicted of murdering his own wife and was currently serving a prison term of 25 years to life.

In support of the 2009 § 2255 Motion, Gonzalez submitted a 63-paragraph sworn affirmation (see Affirmation of Pedro Gonzalez dated December 1, 2009 ("Gonzalez 2009 Aff.")), describing in detail the events leading to his arrest, beginning with his being contacted by one of the government's confidential informants (see, e.g., id. ¶¶ 1-7), and describing Perez-Olivo's lack of

attention to Gonzalez's case despite having been paid a retainer of some $35,000 (see, e.g., id. ¶¶ 9-13, 18, 24-25, 27). Gonzalez stated that Perez-Olivo had had him sign the Plea Agreement without allowing him to read it or even explaining to him what it was (see id. ¶ 36) and had instructed him to "agree with everything that was being said" at the plea hearing in order "not to upset the judge" or risk losing benefits the government had promised (id. ¶ 35).

After the plea hearing, Gonzalez did not see Perez-Olivo again until the day of sentencing, some 10 months later. (See id. ¶ 39.) Perez-Olivo did not attend Gonzalez's post-plea debriefing sessions with the government (see id.; S.Tr. 16-17); he did not attend Gonzalez's interview with the Probation Department (see Gonzalez 2009 Aff. ¶ 39); and he did not communicate with Gonzalez about the proposed PSR (see, e.g., id. ¶¶ 41-44). On the day of sentencing, Perez-Olivo met with Gonzalez for just 15 minutes, showed him the PSR but did not have him read it, and never fully explained it to him. (See, e.g., id. ¶¶ 55-56.)

The 2009 § 2255 Motion also pointed out Perez-Olivo's failures to engage in any advocacy with respect to Gonzalez's sentencing, including the facts that Perez-Olivo took no issue with the PSR, did not file a sentencing memorandum, did not respond to the government's sentencing memorandum, and did not point out to the court even orally the feasible grounds for a vertical or horizontal departure from the Guidelines-recommended range of imprisonment. Gonzalez requested that the court either vacate his conviction and sentence and hold a trial, or vacate his sentence and conduct a new sentencing proceeding.

In 2010, in light of the Supreme Court's then-recent decision in Padilla v. Kentucky, 559 U.S. 356 (2010), Gonzalez was allowed to add to his 2009 § 2255 Motion an ineffectiveness

claim asserting that Perez-Olivo had never advised him that pleading guilty would expose him to deportation (the "Padilla claim"). That claim has now been mooted by the Supreme Court's decision in Chaidez v. United States, 133 S. Ct. 1103, 1113 (2013), holding that the ruling in Padilla is not applicable on collateral review of a conviction that was final at the time of the Padilla decision; but, as discussed below, the Padilla claim was one of the main foci of the district court's decision on the 2009 § 2255 Motion.

In a Decision and Order dated August 5, 2010 ("August 2010 Order" or "Gonzalez V"), the district court denied Gonzalez's § 2255 motion. Although largely agreeing that Perez-Olivo's performance with respect to Gonzalez's sentencing was deficient, i.e., outside the range of professionally competent assistance, the court ruled, with respect to both the plea of guilty and sentencing, that Gonzalez did not demonstrate prejudice, i.e., that there was a reasonable probability that, but for Perez-Olivo's unprofessional performance the results of the proceedings would have been different, see, e.g., Strickland v. Washington, 466 U.S. 668 (1984).

As to the claim that Perez-Olivo had provided ineffective assistance with respect to Gonzalez's decision whether or not to plead guilty, the district court in Gonzalez V principally addressed Gonzalez's Padilla claim. The court "accept[ed Gonzalez's] allegations that counsel failed to inform him of the deportation consequences of his guilty plea as true," August 2010 Order at 6, and found that that performance fell below an acceptable level of competence, see id. at 6-7; but the court concluded that Gonzalez could not show prejudice as a result of that failure, see id. at 7-10. With respect to prejudice, the court stated that Gonzalez (a) "must show 'a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial,'" August

17

2010 Order at 7 (quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)); (b) must corroborate his statements with "'some objective evidence other than defendant's [own] assertions,'" August 2010 Order at 7 (quoting Pham v. United States, 317 F.3d 178, 182 (2d Cir. 2003)); and (c) "must . . . show that a decision to reject the plea bargain would have been rational under the circumstances," August 2010 Order at 7 (citing Roe v. Flores-Ortega, 528 U.S. 470, 480, 486 (2000)). In concluding that Gonzalez had not established prejudice, the judge--who not only had heard the government's plea-hearing description of the evidence against Gonzalez and Gonzalez's admission of the acts described (see Plea Tr. 17-21), but also had presided over the trial of Ceballos, which prominently featured evidence of pervasive illegal conduct by Gonzalez, see, e.g., United States v. Ceballos, 340 F.3d at 118-122, 123, 125-29--stated that Gonzalez could not

> show that a decision to go to trial rather than accept the plea offer would have been rational. . . . At trial, Petitioner would have faced overwhelming evidence of guilt based on testimony from undercover agents that Petitioner personally delivered large quantities of drugs to them, as well as video and audio-taped conversations between Petitioner and undercover DEA and state police agents. . . . Petitioner therefore faced an overwhelming likelihood of conviction at trial and a significantly longer term of imprisonment than his actual sentence of 210 months, followed by mandatory deportation. . . . Under these circumstances, Petitioner cannot show that a rational defendant would have chosen to go to trial.

August 2010 Order at 10 (emphases added).

With respect to Gonzalez's non-Padilla claims, i.e., his allegations that Perez-Olivo had "failed to investigate potential affirmative defenses, failed to seek discovery, and failed to request a bill of particulars," the court stated that "[t]he same analysis and conclusion applies . . . ." Id. at 10.

As to sentencing, the court found, and noted that "the government does not contest, that [Perez-Olivo's] performance did not meet an objectively reasonable standard of representation." Id.

at 11. The court noted that Perez-Olivo had

> failed to submit a sentencing memorandum in support of his client, to seek any benefit based upon Petitioner's attempts to cooperate with the government, to challenge the imposition of an aggravating role enhancement, and to seek a downward departure. . . . The Court . . . not[es] also that counsel's "pattern of 'cut-and-run' representation" of criminal defendants is well established, and that counsel has since been disbarred in the State of New York and in Puerto Rico after allegations of providing ineffective assistance and violating professional standards in those jurisdictions.

Id.

However, with respect to sentencing too, the court concluded in Gonzalez V that Gonzalez had failed to show that the deficient performance caused him prejudice. The court stated that

> "an analysis focusing solely on mere outcome determination, without attention to whether the result . . . was fundamentally unfair or unreliable, is defective." Lockhart v. Fretwell, 506 U.S. 364, 368 (1993). The Court notes also that "setting aside a . . . sentence solely because the outcome would have been different but for counsel's error may grant the defendant a windfall to which the law does not entitle him." United States v. Cronic, 466 U.S. 648, 658 (1984).
>
> . . . . Consequently, the Court examines whether counsel's inadequate assistance at sentencing had an adverse effect on Petitioner's sentence and whether this adverse effect rendered the proceeding fundamentally unfair or unreliable.

August 2010 Order at 11-12 (emphases ours). Although noting that Gonzalez had "describe[d] a number of practical and effective trial strategies that counsel should or could have pursued," id. at 13, the court concluded that Gonzalez "fail[ed] to show that the deficient representation he received from trial counsel adversely affected the length of his sentence," id. at 16. (See also Part II.C. below.)

Judgment was entered denying the 2009 § 2255 Motion. This Court granted a certificate of appealability.

## II. DISCUSSION

On appeal, Gonzalez contends principally that the district court erred (a) in ruling that he suffered no prejudice as a result of Perez-Olivo's deficient performance with respect to the plea of guilty and sentence, and (b) in failing, pursuant to 28 U.S.C. § 2255, to allow discovery and to conduct an evidentiary hearing on the IAC claims. Gonzalez's brief on appeal requests that we "vacate his conviction and sentence; or vacate his sentence and conduct a new sentencing proceeding; or in the alternative remand for an evidentiary proceeding." (Gonzalez brief on appeal at 56.) At oral argument of the appeal, Gonzalez's counsel, after stating that "Mr. Gonzalez would like to withdraw his plea . . . . [a]nd go to trial," stated that "[i]f he could be vindicated on appeal by a finding of some other ineffective assistance of counsel, I don't think that he necessarily would need to go to trial." (Oral Argument Transcript, Jan. 26, 2012, at 6-7.)

For the reasons that follow, we conclude that Gonzalez is not entitled to discovery, a hearing, or vacatur of his conviction based on his claim of ineffective assistance of counsel with respect to his plea of guilty; but we conclude that he is entitled, represented by competent counsel, to be resentenced.

A.      General Principles Governing § 2255 Proceedings and Constitutionally Required Assistance of Counsel

A defendant in criminal proceedings has a right under the Sixth Amendment to effective assistance from his attorney at all critical stages in the proceedings, which include entry of a plea of guilty, see, e.g., Hill v. Lockhart, 474 U.S. 52, 58 (1985); see generally Missouri v. Frye, 132 S. Ct. 1399, 1405 (2012), and sentencing, see, e.g., Glover v. United States, 531 U.S. 198, 202-04 (2001); Mempa v. Rhay, 389 U.S. 128, 134 (1967). The attorney has an "overarching duty to advocate the defendant's cause." Strickland, 466 U.S. at 688.

In order to succeed on a claim of ineffective assistance of counsel, a claimant must meet the two-pronged test established by Strickland:

> (1) he "must show that counsel's performance was deficient," [Strickland,] 466 U.S. at 687, so deficient that, "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance," id. at 690; and (2) he must show "that the deficient performance prejudiced the defense," id. at 687, in the sense that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," id. at 694.

Bennett v. United States, 663 F.3d 71, 84 (2d Cir. 2011). "'[B]oth the performance and prejudice components of the ineffectiveness inquiry are mixed questions of law and fact,' . . . and we review a district court's conclusions on those issues de novo." Id. at 85 (quoting Strickland, 466 U.S. at 698). "The IAC claim must be rejected if the defendant fails to meet either the performance prong or the prejudice prong." Bennett v. United States, 663 F.3d at 85; see, e.g., Strickland, 466 U.S. at 687, 697.

In order to satisfy the prejudice prong with respect to a claim focusing on a plea of guilty, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill, 474 U.S. at 59.

With respect to a claim of ineffective assistance in sentencing, the defendant must show a reasonable probability that, but for counsel's substandard performance, he would have received a less severe sentence. See generally Lafler v. Cooper, 132 S. Ct. 1376, 1387 (2012); Glover v. United States, 531 U.S. 198, 203 (2001) ("Authority does not suggest that a minimal amount of additional time in prison cannot constitute prejudice. Quite to the contrary, our jurisprudence suggests that any amount of actual jail time has Sixth Amendment significance.").

In ruling on a motion under § 2255, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; see, e.g., Pham v. United States, 317 F.3d 178, 185 (2d Cir. 2003) (§ 2255 does not permit summary dismissals of motions that present facially valid claims). However, the filing of a motion pursuant to § 2255 does not automatically entitle the movant to a hearing; that section does not imply that there must be a hearing where the allegations are "vague, conclusory, or palpably incredible." Machibroda v. United States, 368 U.S. 487, 495 (1962); see, e.g., Chang v. United States, 250 F.3d 79, 85 (2d Cir. 2001). To warrant a hearing, the motion must set forth specific facts supported by competent evidence, raising detailed and controverted issues of fact that, if proved at a hearing, would entitle him to relief. See, e.g., Machibroda, 368 U.S. at 494; United States v. Aiello, 814 F.2d 109, 113-14 (2d Cir. 1987).

In determining whether the assertions in a § 2255 motion warrant discovery or a hearing, the court must also take into account admissions made by the defendant at his plea hearing, for "[s]olemn declarations in open court carry a strong presumption of verity." Blackledge v. Allison, 431 U.S. 63, 74 (1977). "[S]ubsequent presentation of conclusory allegations unsupported by

specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible." Id. Compare id. at 76 (allegations that the plea was induced by an unkept promise were not vague or conclusory where the motion "indicated exactly what the terms of the promise were; when, where, and by whom the promise had been made; and the identity of one witness to its communication" (emphasis added)), with United States v. Patasnik, 89 F.3d 63, 68 (2d Cir. 1996) ("Patasnik") (allegations that the plea resulted from substandard advice because the attorney "failed 'to investigate [Patasnik's] background and prior record,' failed 'to listen to [Patasnik's] version of the case,' failed 'to prepare properly for possible defenses available to the defendant,' and did 'not properly investigate[] defendant's case and . . . prepare[] himself for trial'" were "conclusory" where the defendant "point[ed] to nothing in his 'background,' 'prior record' or 'version of the case' that would have made a lawyer optimistic about taking the case to trial," and did "no[t] . . . explain what 'possible defenses' he ha[d] in mind that might have caused [the attorney] to give different advice" (emphasis added)).

We review for abuse of discretion a district court's decision as to what kind of hearing on a § 2255 motion is appropriate, see, e.g., Chang v. United States, 250 F.3d at 86, or its decision that the defendant's allegations do not warrant an evidentiary hearing at all, see, e.g., Pham v. United States, 317 F.3d at 182. A court abuses its discretion when it takes an erroneous view of the law, makes a clearly erroneous assessment of the facts, or renders a decision that cannot be located within the range of permissible decisions. See, e.g., United States v. Figueroa, 548 F.3d 222, 226 (2d Cir. 2008).

23

B. Gonzalez's IAC Claim With Regard to Pleading Guilty

Gonzalez's claim that he received ineffective assistance with respect to his decision to plead guilty--bereft of any Padilla claim, because his conviction became final before Padilla was decided--is principally that Perez-Olivo failed to adequately investigate potential affirmative defenses, to seek discovery, and to request a bill of particulars (see, e.g., Gonzalez brief on appeal at 13, 14; 2009 § 2255 Motion at 8-12). Although we conclude that the district court properly rejected this IAC claim, we reach that conclusion on a ground apparently different from that adopted by the district court. See generally Headley v. Tilghman, 53 F.3d 472, 476 (2d Cir.) (we are free to affirm a decision of the district court on any ground for which there is support in the record, regardless of the ground on which that court relied), cert. denied, 516 U.S. 877 (1995).

1. The Alleged Prejudice With Respect to Entry of the Plea

Although it is clear that the district court ruled that Gonzalez had failed to establish prejudice as a result of the alleged substandard performance by Perez-Olivo with respect to his advice leading Gonzalez to enter a plea of guilty, the court's conclusion appears to have been based solely on the strength of the government's case and the likelihood of a longer sentence upon conviction. The court noted that the trial evidence would include (a) testimony by undercover agents that Gonzalez personally delivered large quantities of drugs to them, and (b) video- and audio-taped conversations between Gonzalez and undercover DEA and state police agents, see August 2010 Order at 10, and that Gonzalez would face "a significantly longer term of imprisonment than his actual sentence of 210 months," id. It concluded that Gonzalez thus could not show that he would have declined to plead guilty if provided with adequate advice by Perez-Olivo, because going to trial would not be rational.

24

While a district court's assessment that proceeding to trial would be irrational may be an adequate basis for a finding of no-prejudice in connection with some IAC claims, the court should, before reaching a conclusion as to prejudice, take into account all relevant factors. In reaching its rationality conclusion in the present case, the district court took into account one factor that we consider irrelevant, and it did not mention one that we consider relevant in these circumstances.

The fact that the prison term actually imposed on Gonzalez was 210 months seems an inappropriate factor in the court's consideration of whether going to trial would be rational. While the actual sentence would be a valid consideration if there had been a plea agreement for that specific sentence, accepted by the court pursuant to Fed. R. Crim. P. 11(c)(1)(C) (court's acceptance of such a plea agreement pursuant to this Rule would bind the court), there was no such agreement on a 210-month sentence here. Indeed, there was not even a tentative agreement on a sentencing range close to 210 months. The Plea Agreement contained no estimate as to a Guidelines-recommended range of imprisonment; and at the plea hearing the AUSA predicted that, in the absence of adjustments, the range for Gonzalez in light of his plea of guilty would be 262 to 327 months. Thus, Gonzalez, so far as he knew, faced a term of imprisonment significantly longer than 210 months even upon his decision to plead guilty. The fact that the court would eventually impose a prison term of 210 months, being unknown to Gonzalez, could not be a factor in his decision.

On the other hand, in assessing whether there was a reasonable probability that, absent Perez-Olivo's allegedly substandard performance, Gonzalez would have gone to trial, the district court did not mention the plainly relevant fact, described in Part I.A.1. above, that Gonzalez had actually attempted to withdraw his plea of guilty and go to trial. (See S.Tr. 3-10, 14-22.) Although a defendant has no absolute right to withdraw his plea once entered, see, e.g., United States v. Sweeney,

25

878 F.2d 68, 70 (2d Cir. 1989) ("[s]ociety has a strong interest in the finality of guilty pleas"), certainly the initial choice of whether to plead guilty or to insist on a trial belongs solely to the defendant. A mentally competent defendant--and the record contains no indication whatever that Gonzalez was not mentally competent--has the constitutional right to insist on going to trial rather than pleading guilty, even if the strength of the prosecution's evidence may make that insistence seem irrational. See generally Jones v. Barnes, 463 U.S. 745, 751 (1983) ("the accused has the ultimate authority to make certain fundamental decisions regarding the case, [such] as . . . whether to plead guilty"); Boria v. Keane, 99 F.3d 492, 496-97 (2d Cir. 1996) ("The decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in any criminal case. This decision must ultimately be left to the client's wishes." (internal quotation marks omitted)). "[T]he Strickland inquiry requires [a] probing and fact-specific analysis," Sears v. Upton, 130 S. Ct. 3259, 3266 (2010), and the strength of the government's evidence and the severity of the possible punishment are not always determinative on the issue of whether, in the absence of substandard advice from counsel, a particular defendant would have decided to plead guilty or to go to trial.

Here, the district court mentioned Gonzalez's plea-withdrawal attempt in dealing with a different claim, see August 2010 Order at 4 (noting, in rejecting a conflict-of-interest contention, that "at Petitioner's urging, trial counsel moved to withdraw the guilty plea at the sentencing hearing"). But in finding that Gonzalez had failed to establish prejudice because a rational defendant would not have wanted to go to trial, the court made no mention of the fact that Gonzalez himself had actually attempted to withdraw his plea and go to trial.

26

We do not mean to suggest that the mere fact that a defendant has made a motion to withdraw his plea of guilty dispositively establishes that in the absence of substandard advice from his attorney he would have declined to plead guilty. Indeed, in the present case, the stated basis of Gonzalez's request to withdraw his plea was not related to any performance or lack thereof by Perez-Olivo; the basis was that Gonzalez had been threatened by a member of the prosecution team that if he did not plead guilty he would receive a prison term of 30 years. (See S.Tr. 14-15.) Even a genuine desire to proceed to trial for a reason that is unrelated to counsel's performance does not necessarily establish the prejudice prong in a Strickland inquiry. And, of course, a court might reasonably find in some circumstances that a defendant's request to withdraw his plea of guilty did not reflect a genuine desire to go to trial. But there was no such finding with respect to Gonzalez's request in this case.

In sum, the fact that an attempt was made to withdraw the guilty plea and go to trial may not be dispositive on the issue of IAC prejudice; however, it is a factor that must be considered by the court in assessing whether there is a reasonable probability that but for substandard performance by counsel, the defendant would have chosen to eschew the plea and go to trial. Given that Gonzalez's attempt to withdraw his plea and go to trial does not appear to have been considered by the district court in assessing the reasonable probability that he would have chosen to go to trial but for Perez-Olivo's allegedly substandard performance, we decline to endorse the district court's conclusion that Gonzalez failed to make the requisite showing of prejudice.

27

2. Perez-Olivo's Performance

As discussed in Part II.A. above, § 2255 does not require relief or even a hearing where the allegations are conclusory; and as discussed in Parts I.A.4. and I.B. above, we found in Gonzalez IV that the record as it stood was insufficient to show such failures, see Gonzalez IV, 300 Fed. App'x at 41. We granted Gonzalez leave to file a new § 2255 motion to present "facts, not previously available, that might relate to the performance of counsel (including those that might bear on counsel's effectiveness at the time of Gonzalez's guilty plea)." Id.

In the ensuing § 2255 proceedings, the factual record was augmented by Gonzalez's submission of his 63-paragraph sworn affirmation (see Gonzalez 2009 Aff.) that, as discussed in Part I.B. above, was detailed as to events prior to Gonzalez's arrest, as to interactions between Gonzalez and Perez-Olivo, and as to Perez-Olivo's performance with respect to Gonzalez's sentencing. But the only factual allegations that Perez-Olivo failed to investigate and conduct discovery prior to Gonzalez's entry of his plea are the assertions made in the motion itself, an unsworn document, signed by counsel who had no firsthand knowledge of any conversations between Gonzalez and Perez-Olivo. Gonzalez's 2009 sworn affirmation, despite its length and detail as to other interactions with Perez-Olivo, makes no reference to, and provides no factual support for, the motion's assertions of investigation and discovery failures. The motion noted that "[t]he initial discovery provided to Mr. Perez-Olivo by the United States contained the indictment in Spanish and English, nine video and fifty-six audio recordings, and police reports." (2009 § 2255 Motion at 3.) The Gonzalez affirmation offers no evidence that additional discovery or investigation was requested or warranted. For example, that affirmation contains no mention whatever of the words or phrases "failed,"

"investigate," "witness," "possible," "defense," "discovery," "bill of particulars," "evidence," "assess," "evaluate," "examine," "listen," "neglected," "lead," or "follow up." Nor does the affirmation contain any allegation in substance that Perez-Olivo failed to investigate any aspects of the case that could have led to a successful defense by Gonzalez if the charges against him were tried.

Thus, the record that Gonzalez IV found lacking in factual allegations to support Gonzalez's IAC claims was not thereafter augmented in any way with competent evidence to support the conclusory allegation that Gonzalez was denied effective assistance of counsel in connection with his decision to plead guilty because of failures to conduct investigations or discovery, see, e.g., Patasnik, 89 F.3d at 68 ("conclusory statements" that an attorney failed to investigate are insufficient where the defendant "points to nothing in his 'background,' 'prior record' or 'version of the case' that would have made a lawyer optimistic about taking the case to trial"). In these circumstances, the district court did not abuse its discretion in not ordering a hearing or discovery.

Finally, we note that although Gonzalez also claimed that Perez-Olivo failed to provide adequate assistance with respect to Gonzalez's motion to withdraw his guilty plea, that claim fails for lack of any showing of prejudice. The only ground asserted by Gonzalez for that motion was that he was told by a member of the government's team that he would receive a 30-year sentence if he did not plead guilty. (See S.Tr. 14-16.) As that motion was substantively meritless, Gonzalez has not explained how competent counsel could have persuaded the district court to grant it.

In light of Gonzalez's failure to develop an appropriate record in support of his claim that Perez-Olivo rendered substandard performance with respect to the plea of guilty, we conclude that Gonzalez is not entitled to withdraw his plea.

C. Gonzalez's IAC Claim With Regard to Sentencing

There is no dispute over whether Perez-Olivo's performance was deficient with regard to sentencing. It was. Gonzalez's affirmation in support of the 2009 § 2255 Motion stated that after his January 2001 plea of guilty, Gonzalez did not see Perez-Olivo again until just before the sentencing hearing in November 2001. (See Gonzalez 2009 Aff. ¶¶ 34-38.) In the interim, Perez-Olivo did not accompany Gonzalez when Gonzalez was interviewed by the Probation Department; Gonzalez was unable to reach Perez-Olivo and was forced to obtain a copy of the PSR from the probation officer; the probation officer informed Gonzalez that she too had been unable to reach Perez-Olivo; and prior to sentencing, Perez-Olivo spent no more than 15 minutes with Gonzalez discussing the PSR. (See id. ¶¶ 39, 41-42, 55.) The district court in Gonzalez V noted also that Perez-Olivo had failed to submit to the court a sentencing memorandum, failed to seek any sentencing leniency based on Gonzalez's attempts to cooperate with the government, failed to challenge the imposition of an aggravating role enhancement, and failed to seek a downward departure. See August 2010 Order at 11. The court found that Perez-Olivo's "performance did not meet an objectively reasonable standard of representation." Id.

The district court concluded, however, that Gonzalez had failed to establish prejudice. We disagree.

First, the district court appears to have imposed on Gonzalez a standard of proof more burdensome than is warranted by Strickland's "reasonable probability" requirement. "A reasonable probability is a probability sufficient to undermine confidence in the outcome," Strickland, 466 U.S. at 694; but "reasonable probability" is a less demanding standard than "more likely than not," e.g.,

30

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "[A] defendant <u>need not</u> show that counsel's deficient conduct <u>more likely than not</u> altered the outcome in the case." *Strickland*, 466 U.S. at 693 (emphases added); <u>see</u>, <u>e.g.</u>, <u>Nix v. Whiteside</u>, 475 U.S. 157, 175 (1986) ("[A] defendant need not establish that the attorney's deficient performance more likely than not altered the outcome in order to establish prejudice under <u>Strickland</u>."). Here, although it had noted that the standard was "a reasonable probability" of a different outcome, August 2010 Order at 11, the district court framed the question as whether Perez-Olivo's inadequate assistance at sentencing "<u>had</u> an adverse effect," <u>id</u>. at 12 (emphasis added); and it concluded that Gonzalez had failed to demonstrate that the substandard performance "<u>adversely affected</u> his sentence," <u>id</u>. at 14-15 (emphasis added). Thus, the district court in assessing the prejudice prong appears to have erroneously applied a standard at least as demanding as more-likely-than-not.

Second, one of the factors considered by the district court in concluding that Gonzalez had not established prejudice as a result of Perez-Olivo's "failure to advocate on [his] behalf" in connection with sentencing was that the prison term to which Gonzalez was sentenced was "at the bottom" of the applicable Guidelines range. August 2010 Order at 14, 15. However, Gonzalez's new counsel argued that adequate advocacy could have lowered the Guidelines range. Counsel argued, <u>inter alia</u>, that Perez-Olivo could have sought a departure from the Guidelines on the basis that Gonzalez's criminal history category of III, which was based on two prior convictions for driving while under the influence of alcohol and on the fact that Gonzalez was on probation when he committed his present offenses, was overstated (<u>see</u> 2009 § 2255 Motion at 32-33). In addition, Gonzalez's new counsel argued that there were discrepancies in the PSR with regard to the drug

quantities at issue, and that any argument that could have reduced the amount of drugs attributed to Gonzalez by as little as 16 grams of cocaine "would have reduced [Gonzalez's] offense level." (Id. at 26-27.) Indeed, the district court stated that "[i]n support of [his sentencing] claim, Petitioner describes a number of practical and <u>effective</u> trial strategies that counsel should or could have pursued." August 2010 Order at 13 (emphasis added).

The problem with regard to the sentencing in this case and with fathoming whether persuasive arguments could have been made on behalf of Gonzalez is that Perez-Olivo did not act as an advocate for Gonzalez at all. "[T]he adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.'" United States v. Cronic, 466 U.S. 648, 656 (1984) (quoting Anders v. California, 386 U.S. 738, 743 (1967)). "While a criminal trial is not a game in which the participants are expected to enter the ring with a near match in skills, neither is it a sacrifice of unarmed prisoners to gladiators." Cronic, 466 U.S. at 657 (internal quotation marks omitted). "'Indeed, an indispensable element of the effective performance of [defense counsel's] responsibilities is the ability to act independently of the Government and to oppose it in adversary litigation[.]'" Id. at 656 n.17 (quoting Ferri v. Ackerman, 444 U.S. 193, 204 (1979)).

Perez-Olivo did little more than simply attend Gonzalez's sentencing hearing. But the fact

> [t]hat a person who happens to be a lawyer is present at [a hearing] alongside the accused . . . is not enough to satisfy the constitutional command. The Sixth Amendment recognizes the right to the assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the [proceeding] is fair.

Strickland, 466 U.S. at 685.

The hypothetical sentencing arguments proffered by Gonzalez's new counsel, along with the district court's reference to some of them as potentially "effective" arguments, suffice to undermine our confidence in the outcome of Gonzalez's original sentencing and thus to show that the reasonable-probability standard with respect to the sentencing claim was met. We conclude that Gonzalez is entitled to be resentenced.

In so concluding, we note our disagreement with the district court's view that setting aside Gonzalez's "sentence solely because the outcome would have been different but for counsel's error may grant [Gonzalez] a windfall to which the law does not entitle him." August 2010 Order at 11 (internal quotation marks omitted). Although the Supreme Court in Lockhart v. Fretwell, 506 U.S. 364 (1993), cautioned against allowing such a windfall, see id. at 369-70, that case involved the prospect of reversing a defendant's conviction on the basis of a court case that, subsequent to the defendant's trial, was overruled, see id. at 371. There are no such circumstances here with respect to Gonzalez's IAC claim based on sentencing. It is up to the district court to determine what Gonzalez's sentence should be, with Gonzalez represented by competent counsel. If competent counsel does not persuade the district court that a shorter sentence should have been imposed, the court is free to reimpose the same sentence. If counsel persuades the court that the sentence on Gonzalez should have been shorter, the new sentence can hardly be deemed a windfall.

CONCLUSION

We have considered all of the parties' arguments in support of their respective positions on this appeal and have found them to be without merit except as indicated above. The order denying Gonzalez's 2009 § 2255 Motion is vacated, and the matter is remanded for the district court to appoint or continue the appointment of competent counsel for Gonzalez with respect to resentencing, to vacate the judgment, and to resentence Gonzalez, consistent with this opinion.